J. Arthur WHITE et al., Plaintiffs-Appellees,

v.

Paul ABRAMS, Defendant-Appellant.

Robert HOFFMAN, Plaintiff-Appellee,

v.

Paul ABRAMS, Defendant-Appellant.

Robert HOFFMAN, Plaintiff-Appellant,

v.

Paul ABRAMS, Defendant-Appellee.

J. Arthur WHITE et al., Plaintiffs-Appellants,

v.

Paul ABRAMS, Defendant-Appellee.

Nos. 71–2068, 71–2069, 71–2076, 71–2077.

United States Court of Appeals, Ninth Circuit.

March 15, 1974.

Petition for rehearing denied June 11, 1974.

Oliver F. Green, Jr. (argued) and Douglas C. Conroy, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for appellant in 71–2068 and 71–2069 and for appellee in 71–2076 and 71–2077.

Thomas F. Call (argued), Adams, Duque & Hazeltine, Andrew S. Garb and Alfred I. Rothman, Los Angeles, Cal., for appellee in 71–2068 and 71–2069 and for appellant in 71–2076 and 71–2077.

Before BARNES and WALLACE, Circuit Judges, and TAYLOR,* District Judge.

WALLACE, Circuit Judge:

Abrams appeals from a jury verdict awarding damages against him for violations of the federal securities laws. The case arises out of his actions in connection with investments that White and others who invested with or through White (White Group) made in corporations owned and controlled by Theodore Richmond, now deceased. Abrams raises six points on appeal. We agree with his first contention that the trial court erred in instructing the jury that defendant violated the federal securities laws if he made a material misrepresentation, even if he did not know the falsity of his statement. We reverse and remand.

## I. FACTUAL BACKGROUND

After a long relationship as a trusted friend and advisor, during which White had made a number of successful investments through him, Abrams encouraged White to invest substantial sums of money in several of 26 corporations owned and controlled primarily by Theodore Richmond (Richmond Corporations).[1] Richmond operated bus lines in New York and New Jersey from 1948 until 1967 through a complex structure of corporations consisting of finance,

---

* Honorable Fred M. Taylor, United States District Judge, Boise, Idaho, sitting by designation.

1. See Manufacturers Credit Corp. v. SEC, 395 F.2d 833 (3d Cir. 1968), dealing with the bankruptcy proceedings of the Richmond Corporations, for background to the present case.

real estate, bus leasing and bus operating corporations, all involved in one aspect or another, in operating the same bus lines. Early in their history, the Richmond Corporations began selling their own unsecured corporate promissory notes bearing interest at rates ranging from 12 to 20% per annum and generally maturing in three years. As the Richmond Corporations' loans increased to the point that the profits from the bus lines were insufficient to pay current interest and the principal on the matured loans, the corporations borrowed additional money to meet these obligations. At the time of bankruptcy the corporations owed approximately $58,000,000 to about 5,000 persons. In addition, the corporations owed over $9,000,000 to institutional lenders such as Chase Manhattan Bank, Talcott Factors and General Motors Acceptance Corporation. In 1966, the year prior to bankruptcy, the corporations paid $6,000,000 in interest and another $8,000,000 on principal.

In 1956 Abrams began soliciting loans from private lenders for the Richmond Corporations, receiving in some instances a commission as high as 4% per annum for each year the money was left with the corporations. At the time of bankruptcy, the Richmond Corporations owed in excess of $3,000,000 to persons who had made loans through Abrams. Abrams did not sell any stocks or promissory notes, but did make arrangements for their purchase from the Richmond Corporations. The majority of the White Group's loans were made to Manufacturers Credit Corporation, a holding company, which had as its sole asset the stock of the other 25 Richmond Corporations. The White Group had made loans, bearing interest at the rate of 12 to 14% per annum, to the Richmond Corporations over a period from 1959 until mid-1967 when the corporations filed for bankruptcy. The White Group also purchased stock, with an option in

Richmond to repurchase at a price calculated at a fixed annual rate of return, approximately the same as the interest rate on the loans. At the time of bankruptcy, Mr. and Mrs. J. Arthur White and their daughter Margo, the largest investors of the White Group, held promissory notes in the total sum of $455,000 and stock in the sum of $260,000. They had been receiving interest continuously since 1959 on the promissory notes from Richmond that totalled $346,575.

The White Group charges Abrams with violations of section 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)],[2] section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)], rule 10b–5 [17 C.F.R. § 240.-10b–5] and with common law fraud and seeks rescission and punitive damages. The jury found no liability under the charge of common law fraud. The White Group complains that Abrams misrepresented to them (1) that he had investigated Richmond and his corporations, examined the corporations' financial statements and found the corporations and Richmond to be financially sound, (2) that Richmond would use the borrowed money to purchase new franchises, bus lines and additional bus equipment and (3) that the Richmond Corporations had large earnings and were well able to pay the high interest on the loans. They further complain that Abrams failed to disclose (1) that he was receiving a large commission on each investment made through him in the Richmond Corporations, (2) that he sold similar securities and loans to other persons at higher rates of return, in some instances up to 20% per annum and (3) that Manufacturers Credit Corporation owned no assets other than the stock in other Richmond Corporations. They also allege that Abrams conspired with Richmond to use unrecorded "second mortgages," "registered notes" contain-

2. Since the relevant language of section 17(a) is almost identical to the language of rule 10b–5, we will assume that the elements for a private action under that section are the same as the elements for an action under rule 10b–5. *See* Lanza v. Drexel & Co., 479 F.2d 1277, 1280 n. 2 (2d Cir. 1973).

ing misleading language and other "lures" as a scheme, device or artifice to defraud.

After seven weeks of trial the case was submitted to the jury, which found in favor of the plaintiffs and awarded compensatory damages in the total amount of $1,101,982. Punitive damages were not allowed. The court subsequently decided it had erroneously allowed prejudgment interest and decreased the total award to $867,200. This resulted in a cross-appeal by the White Group.

## II. ABSOLUTE LIABILITY JURY INSTRUCTION

■■ Abrams argues that the trial court improperly instructed the jury as to the scope of duty imposed by clause (b) of rule 10b–5 which makes it unlawful for any person in connection with the sale or purchase of securities "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . ." SEC Rule 10b–5(b), 17 C.F.R. § 240.10b–5(b). The trial court instructed on the question of material misrepresentations as follows:

> If you find that defendant made a material misrepresentation to plaintiffs in connection with the sale to plaintiffs of a promissory note or share of stock, the law is that defendant has violated the Federal securities

laws *even if you find that defendant did not know* the falsity of the misrepresentation he made to plaintiffs. (Emphasis added.)

The court's instruction would impose upon Abrams a duty to insure the truthfulness and reliability of the representations he has made. We reject such a broad construction since there is no indication that Congress, in passing section 10(b) of the Securities Exchange Act of 1934, or that the Securities and Exchange Commission, in issuing rule 10b–5 thereunder, intended that "anyone should be an insurer against false or misleading statements made non-negligently or in good faith." Kohn v. American Metal Climax, Inc., 458 F.2d 255, 280 (3d Cir. 1972) (Adams, J., concurring and dissenting). *See* List v. Fashion Park, Inc., 340 F.2d 457, 463 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965) (purpose of rule 10b–5 is to qualify the rule of caveat emptor—not to establish a scheme of investors' insurance). The instruction proposed by the White Group, objected to by Abrams and given by the trial court, imposes a liability without fault which we find to be contrary to the basic thrust of the statute and rule.

## III. PRIOR NINTH CIRCUIT DECISIONS

In attempting to define the broad duty imposed under the rule, the courts have traditionally focused upon the defendant's state of mind, generally utilizing the catchword "scienter."[3] The

---

3. The word "scienter" has been used in so many varied meanings that for the sake of progressing jurisprudence it would be better if courts avoided using it altogether in connection with rule 10b–5 cases. Professor Bromberg writes:

> Much of the difficulty over *scienter* comes from varying, and often imprecise and contradictory, uses of the word. For example, Note, 63 Mich.L.Rev. 1070, 1075 (1965) distinguishes traditional *scienter* (actual knowledge of falsity) from modern *scienter* (defendant would or should have known of falsity had he used due care of investigation, i. e., constructive knowledge).

An even more traditional *scienter* of intent to deceive is sometimes meant. In 1967 the 2d Circuit was speaking of "some form of the traditional scienter requirement." Barnes v. Osofsky, 373 F.2d 269, 272 (2d Cir. 1967). The following year, in a leading case, it held that the phrase is broad enough to cover "lack of diligence, constructive fraud, or unreasonable or negligent conduct" as well as specific fraudulent intent. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 855 (2d Cir. in banc 1968), cert. denied, 394 U.S. 976 [89 S.Ct. 1454, 22 L.Ed.2d 756] (1969). (parallel citations omitted)

question of what state of mind should be required before a court will impose liability has been a source of controversy in federal securities law since the Second Circuit said in Fischman v. Raytheon Mfg. Co., 188 F.2d 783, 786 (2d Cir. 1951), that "proof of fraud is required in suits under § 10(b) of the 1934 Act and Rule X–10 B–5 . . . ." Early in this controversy we rejected the notion that common law fraud or scienter must be proven in order to recover under rule 10b–5. In Ellis v. Carter, 291 F.2d 270, 274 (9th Cir. 1961), we were urged by the appellees to hold that genuine fraud, as opposed to "a mere misstatement or omission," must be alleged and proved on the ground that proscribing material misstatements and half-truths without using fraud or scienter language would not be a permissible implementation of section 10(b). We disagreed and said:

> Section 10(b) speaks in terms of the use of "any manipulative device or contrivance . . . ." Had Congress intended to [proscribe] common-law fraud, it would probably have said so. We see no reason to go beyond the plain meaning of the word "any", indicating that the use of manipulative or deceptive devices or contrivances of whatever kind may be forbidden, to construe the statute as if it read "any fraudulent" devices.

In *Ellis* we were concerned primarily with whether rule 10b–5 gave a private remedy to a buyer as well as a seller of securities. We held on the pleadings that a buyer did have a private remedy under the rule and rejected the defendants' additional challenge that plaintiff must allege and ultimately prove genuine fraud.[4]

Subsequently, in Royal Air Properties, Inc. v. Smith, 312 F.2d 210, 212 (9th Cir. 1962), we reaffirmed our position that common law fraud need not be alleged or proved to recover under rule 10b–5:

> In an action brought under section 10(b), common law fraud need not be alleged or ultimately proved. After establishing the use of some means of interstate commerce, the mails, or any national stock exchange facility . . . Rule 10b–5(b), a proper implementation of section 10(b), only requires proof of a material misstatement or an omission of a material fact in connection with the purchase or sale of any security to make out a prima facie case.

After finding that the plaintiff had established a prima facie violation of section 10(b), we held that the trial court erred in not allowing the affirmative defenses of estoppel, waiver and laches. A prima facie case, as we used the term in *Royal Air*, consists of sufficient evidence *in that type of case* to get plaintiff past a motion for a directed verdict in a jury case or motion to dismiss pursuant to Fed.R.Civ.P. 41(b) in a nonjury case. It is the evidence necessary to require a defendant to proceed with his case. In rule 10b–5 cases, where much of the evidence needed by the plaintiff to prove his case is in the

---

2 A. Bromberg, Securities Law: Fraud § 8.- 4(503), at 204.102–.103 (1971). Too often in this area the courts have used words the same as Lewis Carroll's Humpty Dumpty:

"When *I* use a word," Humpty Dumpty said in a rather scornful tone, "it means just what I choose it to mean—neither more nor less."

"The question is," said Alice, "whether you *can* make words mean so many different things."

"The question is," said Humpty Dumpty, "which is to be master—that's all."

L. Carroll, Through the Looking Glass (1871), reprinted in The Annotated Alice 269 (M. Gardner ed. 1960). *See* Bucklo, Scienter and Rule 10b–5, 67 Nw.U.L.Rev. 562, 567–71 (1972); Mann, Rule 10b–5: Evolution of a Continuum of Conduct to Replace the Catch Phrases of Negligence and Scienter, 45 N.Y.U.L.Rev. 1206, 1207–1209 (1970).

4. We reaffirmed this as the holding of *Ellis* in Douglass v. Glenn E. Hinton Investments, Inc., 440 F.2d 912, 915 (9th Cir. 1971), specifically stating that scienter was unnecessary.

hands of the defendant, we require a lesser amount of evidence to avoid a directed verdict or dismissal at the end of the plaintiff's case than we require for a final judgment. In such cases where the evidence is fairly close, it is inadvisable to sustain a defendant's motion to dismiss midway through the trial, even though technically the plaintiff may not have yet developed sufficient evidence for a final judgment, since as the defendant proceeds with his case, the plaintiff may well on cross-examination be able to develop points that will strengthen his case. 5 J. Moore, Federal Practice ¶ 41.13[4], at 1159 (2d ed. 1971). For that reason, we have set a lesser standard in 10b–5 cases when ruling on motions at the end of plaintiff's case-in-chief. Thus in *Royal Air* the plaintiff presented sufficient evidence to require the defendants to proceed with their case. When *Royal Air* came before us on a second appeal, we affirmed the trial court's decision, which it made after hearing the affirmative defenses, that there was sufficient evidence to support a final judgment for the plaintiffs. Royal Air Properties, Inc. v. Smith, 333 F.2d 568, 569 (9th Cir. 1964).

As is obvious from this discussion, our statement as to what constitutes a prima facie case in *Royal Air* should not be misconstrued as the standard of liability for a rule 10b–5 case. This is adequately demonstrated by the fact that in *Royal Air* we considered more than the sterile fact that the defendants had made a material misrepresentation. In addition to that fact, we noted that the defendants had either knowledge of or ready access to the information which, when omitted, made the statements to the plaintiff misleading and that the defendants had initiated the stock transaction and had actively solicited a purchase of stock by the plaintiff. 312 F.2d at 211–212. In the second *Royal Air*, in affirming the trial court's ultimate finding of liability, we also noted that the plaintiff did not have knowledge of or reasonable access to the information

that the defendant omitted and that the plaintiff's lack of business sophistication made him over trusting in the defendant and in the reliability of his statements. 333 F.2d at 570–573. The significance of this factual background will become even more important as we discuss later the liability test for a rule 10b–5 case.

## IV. THE FLEXIBLE DUTY STANDARD

### A. Background

The language of *Ellis* and *Royal Air* has been the basis of a great deal of scholarly and judicial review, criticism and even speculation. Most commentators have rejected the notion that we intended to impose liability without fault and have either dismissed the language as dicta, e. g. Bucklo, Scienter and Rule 10b–5, 67 Nw.U.L.Rev. 562, 581–82 (1972), or interpreted it as requiring only proof of negligence rather than some stricter version of scienter, e. g., City Nat'l Bank v. Vanderboom, 422 F. 2d 221, 230 n.9 (8th Cir.), cert. denied, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970); 2 A. Bromberg, Securities Law: Fraud § 8.4(630), at 204.243 (1971); Note, Proof of Scienter Necessary in a Private Suit under SEC Antifraud Rule 10b–5, 63 Mich.L.Rev. 1070, 1077 (1965). We have not until now had occasion to explain more fully what we meant in *Ellis* and *Royal Air* nor to define more precisely the scope of liability imposed by rule 10b–5.

When the courts first began to allow private remedies under rule 10b–5, most followed a compartmentalized approach by requiring some semblance of the traditional elements of common law fraud: materiality, scienter, reliance, causation and damages. As federal antifraud litigation has further developed, however, the trend has been to modify or completely eliminate some of these elements. See e. g., Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); 2 A. Bromberg, Securities Law: Fraud §§ 8.- 1, 8.9 (1971). The courts have recog-

nized that if the Congressional purpose is to be accomplished, the federal securities laws must be construed liberally and flexibly. In Affiliated Ute Citizens v. United States, 406 U.S. 128, 151, 92 S. Ct. 1456, 1471, 31 L.Ed.2d 741 (1972), the Court recently said:

> The Court has said that the 1934 Act and its companion legislative enactments embrace a "fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." SEC v. Capital Gains Research Bureau, 375 U.S. 180, 186, [84 S.Ct. 275, 280, 11 L.Ed.2d 237] (1963). In the case just cited the Court noted that Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed "not technically and restrictively, but flexibly to effectuate its remedial purposes." *Id.*, at 195 [84 S.Ct., at 285]. This was recently said once again in Supintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 12 [92 S. Ct. 165, 169, 30 L.Ed.2d 128] (1971). (footnotes omitted)

In *Ute*, the Court held that the court of appeals erred in requiring evidence of reliance on material fact misrepresentations for rule 10b–5 liability, where the defendants had induced shareholders "to dispose of their shares without disclosing to them material facts that reasonably could have been expected to influence their decisions to sell." 406 U.S. at 153, 92 S.Ct. at 1472. In reaching this result, the Court focused on the language of the rule prohibiting a "course of business" or a "device, scheme, or artifice" that operates as a fraud in determining the extent of the *duty* that rule 10b–5 imposes upon persons connected with the sale or purchase of securities. Although the Court did not discuss the scope of the duty imposed by clause (b) of the rule, we believe it is significant that it considered a number of factors such as the defendants' relationship to the plaintiffs,[5] the benefit the defendants derived from the sale of the stock,[6] the access the defendants had to the undisclosed information as compared with the access of the plaintiffs,[7] and the activity of the defendants in encouraging the plaintiffs to sell their stock.[8] *See* Comment, Affiliated Ute Citizens v. United States—The Supreme Court Speaks on Rule 10b–5, 1973 Utah L.Rev. 119, 127–31. Notably, the Court did not analyze the defendants' conduct in terms of the elements of common law fraud, but rather as what kind of a *duty* rule 10b–5 imposes.[9] Although the elements

---

5. The bank itself had acknowledged, by letter to AUC in January 1958, that "it would be our duty to see that these transfers were properly made" and that, with respect to the sale of shares, "the bank would be acting for the individual stockholders." The mixed-blood sellers "considered these defendants to be familiar with the market for the shares of stock and relied upon them when they desired to sell their shares." 406 U.S. at 152, 92 S.Ct. at 1471, *citing* Reyos v. United States, 431 F.2d 1337, 1347 (10th Cir. 1970).

6. The defendants "received increased deposits because of the development of this market. The two men also received commissions and gratuities from the expectant non-Indian buyers.

. . . .

The sellers had the right to know that the defendants were in a position to gain financially from their sales . . . ." 406 U.S. at 152–153, 92 S.Ct. at 1471.

7. The defendants "were 'entirely familiar with the prevailing market for the shares at all material times.'" 406 U.S. at 152, 92 S. Ct. at 1471, *citing* Reyos v. United States, 431 F.2d 1337, 1347 (10th Cir. 1970).

8. The defendants also "'were active in encouraging a market for the UDC stock among non-Indians.' 431 F.2d at 1345. They did this by soliciting and accepting standing orders from non-Indians.

. . . .

[T]he defendants devised a plan and induced the mixed-blood holders of UDC stock to dispose of their shares . . . ." 406 U.S. at 152–53, 92 S.Ct. at 1471, *citing* Reyos v. United States, 431 F.2d 1337, 1345 (10th Cir. 1970).

9. The defendants "possessed the affirmative duty under the Rule to disclose . . . [that they were active market makers] to the mixed-blood sellers. See Chasins v. Smith, Barney & Co., 438 F.2d 1167 (CA2 1970)." 406 U.S. at 153, 92 S.Ct. at 1472.

of common law fraud were important in defining what factors should be considered, they were neither limits nor barriers to the extent of the defendants' duty under the rule.

The expressions of the Court are not only meaningful, but chart the way for a proper analysis of 10b–5 liability. It is not based upon easily defined, well-known legal theories such as common law fraud, nor is it based upon convenient, differently interpreted, shorthand latin phrases behind which one can sweep complex determinations. Rather, we are to examine the totality of the factual context and measure it by the duty imposed on the defendant.

### B. Duty Standard of the Second Circuit

Recently the Second Circuit began to develop a duty analysis approach. In Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341 (2d Cir. 1973), it held that section 14(e) of the Exchange Act created a private action for misrepresentations and omissions made in connection with a tender offer. In defining the elements of a section 14(e) action, the court noted that since the underlying proscriptions were virtually identical, the principles developed under rule 10b–5 should apply. The Second Circuit, citing our Royal Air and Ellis cases for authority, stated: "The initial inquiry in each case is what duty of disclosure the law should impose upon the person being sued." 480 F.2d at 363. We hold this to be the correct approach in rule 10b–5 cases. We believe it unfortunate that the Second Circuit attempted to limit this duty by requiring some degree of scienter or culpability and by holding that mere negligent conduct would not be sufficient for liability. The exact standard that the court would apply, however, is not clear to us.

The court's reasoning in defining culpability was, first, to ask what duty of disclosure the law should impose upon the person being sued, second, to examine factors such as the access to information or special relationships that may impose an "affirmative duty" of disclosure, third, to decide whether the person has knowingly or recklessly failed to discharge these duties. The court then summarized that these three liability factors could be stated as:

> whether plaintiff has established that defendant either (1) knew the material facts that were misstated or omitted, or (2) failed or refused to ascertain such facts when they were available to him or *could have been discovered by him with reasonable effort*.

480 F.2d at 364 (emphasis added). It may well be that the analysis in Chris-Craft accurately reflects what the courts have been doing in deciding what state of mind is sufficient for recovery under rule 10b–5,[10] but we choose not to adopt it. We have difficulty with the court's announced position that mere negligence is not sufficient for liability while in the same case it summarizes with language that sets forth a negligence standard, at least for persons with a special duty.

One month after Chris-Craft, the Second Circuit, sitting en banc, again used a duty analysis in defining rule 10b–5 liability in relation to a corporate director. In Lanza v. Drexel & Co., 479 F.2d 1277 (2d Cir. 1973), it affirmed a trial court's decision rejecting the contention that the defendant corporate director had violated rule 10b–5 because as a matter of law,

> in the circumstances disclosed by the record, he was under no duty to investigate more than he did at the material times or to seek out and advise the plaintiffs in any way.

479 F.2d at 1289 (quoting the lower court's findings). In support of this conclusion the court,[11] after setting forth

10. *See* Mann, *supra* Note 3, at 1209–10.

11. The court framed the issue as follows:
The debate thus comes to this: 'What duty, if any, does Rule 10b–5 impose on a

director in Coleman's position to insure that all material, adverse information is conveyed to prospective purchasers of the corporation's stock where the director

extensively the history and development of private actions under the securities laws, carefully analyzed the corporate director's relationship to the plaintiffs, his access to the omitted and misrepresented information and his role in conducting the affairs of the corporation. After concluding that the director was under no duty to convey this particular information, the court then announced that in the Second Circuit, a mere negligent omission or misrepresentation is not enough to establish liability under rule 10b–5. Thus the court adopted a duty theory, but set a lower limit on the duty by requiring more than negligent conduct for liability to arise. Judge Hays,[12] dissenting from the majority opinion, would have found that rule 10b–5 did impose upon the director a duty "to acquaint himself with developments in important intercorporate negotiations." His failure to inform himself "was a breach of a duty he owed as a director and a 'controlling person'" to the plaintiffs. Judge Hays then concluded:

> That Coleman's failure to act was negligent as opposed to calculated should not insulate him from liability when action on his part might have prevented the fraud perpetrated by the corporation whose activities he was under a duty to supervise. I would hold, therefore, that Coleman's negligent "omission to state material facts" to the purchasers of BarChris stock was a violation of § 10(b) and Rule 10b–5, and that Coleman should be held liable for the damages which the plaintiffs suffered.

479 F.2d at 1319. The dissent, therefore, also adopted the duty approach, but

does not know that these prospective purchasers are not receiving all such information?
479 F.2d at 1289.

12. Judge Timbers, who agreed with Judge Hays' opinion, paid the following tribute:
[I]t is well recognized that Judge Hays' views on the meaning of Rule 10b–5 for years have been in the vanguard of important developments in this area. See, e. g., Superintendent of Insurance v. Bankers

would not impose the limitation preventing liability based upon negligence.

### C. *Rejection of Compartmentalization*

The Second Circuit's attempt in *Chris-Craft* and *Lanza* to limit the scope of rule 10b–5 duty by reference to common law fraud principles demonstrates the difficulties courts have had in trying to fit a wide varity of complex fact situations and relationships within a single standard of scienter. As Professor Bromberg writes:

> A comprehensive *scienter* standard would have to fit the enormous variability of 10b–5 private suits, including
>
> (1) Whether the violation is misrepresentation, nondisclosure or some more complex scheme or manipulation;
>
> (2) Whether there is privity, a lesser relationship (such as aiding-abetting or conspiracy) or no privity at all (as in insider trading cases); in the parlance of this text, whether the transactions are direct or indirect, personal or impersonal;
>
> (3) Whether there is one plaintiff or thousands;
>
> (4) Whether there is some special relationship between the parties, such as fiduciary-beneficiary or broker-customer;
>
> (5) Whether the relief sought is damages, rescission, injunction or something else.
>
> There is a real question whether a single standard can do the job adequately.

2 A. Bromberg, Securities Law: Fraud § 8.4(513), at 204.115 (1971).

Life and Casualty Co., 404 U.S. 6, 92 S. Ct. 165, 30 L.Ed.2d 128 (1971), unanimously rev'g 430 F.2d 355 (2 Cir. 1970) (Hays, C. J., dissenting); Schoenbaum v. Firstbrook, 405 F.2d 215 (2 Cir. 1968) (en banc opinion by Hays, C. J., reversing panel decision from which Hays, C. J., dissented), cert. denied, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969).
479 F.2d at 1321–1322 n. 3 (Timbers, J., concurring in part and dissenting in part).

Other commentators have also recognized the necessity of departing from the rigid standards of common law fraud if the goals of the securities laws are to be accomplished. After discussing the confusion and varied standards for state of mind that are being applied among and within the different circuits, one commentator writes:

> Instead of perpetuating the practice of discussing scienter and negligence as absolutes which are capable of being objectively applied, more is gained by recognizing that there is a sliding scale which determines what constitutes sufficiently diligent conduct to avoid 10b–5 liability, and that 10b–5 liability is determinable only within the context of the vagaries of the specific facts presented.

Mann, Rule *10b–5: Evolution of a Continuum of Conduct to Replace the Catch Phrases of Negligence and Scienter*, 45 N.Y.U.L.Rev. 1206, 1209 (1970). The commentator then continues by demonstrating that the courts, in dealing with the variety of suits that arise under rule 10b–5, have in actuality been applying a sliding scale, under the guise of a state of mind (scienter) standard, that balances a number of factors in deciding the appropriate duty that should be imposed.[13]

### D. *The Rule*

The proper analysis, as we see it, is not only to focus on the duty of the defendant, but to allow a flexible standard to meet the varied factual contexts without inhibiting the standard with traditional fault concepts which tend to cloud rather than clarify. By adopting such a duty analysis, we avoid the confusion that arises from classifying the defendants as primary and secondary, or from classifying the transactions as direct and indirect. This flexible approach, as compared to the compartmentalized approach, does away with the necessity of creating a separate pigeonhole for each defendant whose involvement in the transaction in question may not fit nicely into one of the previously defined classes.[14]

In this circuit, we have never adhered to the requirement of scienter in the common law fraud sense. While we did not apply liability without fault, our language in *Ellis* and *Royal Air* was apparently construed by the district court to create such a standard. Such a construction is erroneous. It is also erroneous to construe those cases as imposing a negligence standard or any other standard that focuses solely upon state of mind and its various compartmentalizations. We believe that the cases and commentators demonstrate that any attempt to limit the scope of duty in all 10b–5 cases by the use of one standard for state of mind or scienter is confusing and unworkable.[15] Consequently, we reject scienter or any other discussion of state of mind as a necessary and separate element of a 10b–5 action. The proper standard to be applied is the ex-

13. Mann, *supra* Note 3, at 1210–20. *See also* Kohler v. Kohler Co., 319 F.2d 634, 637–38 (7th Cir. 1963), where the court, after noting that section 10(b) and rule 10b–5 were intended to place "upon the insider duties more exacting than mere abstention from what generally is thought to be fraudulent practices . . . .," said:

> [T]he question arises: What are the limits of those duties? We are satisfied that the answer cannot be confined to an abstract rule but must be fashioned case by case as particular facts dictate.

14. *Cf.* Ruder, Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, in Pari Delicto, Indemnification, and Contribution, 120 U.Pa.L.Rev. 597, 620–30 (1972).

15. In SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 194, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963), the Court, in discussing the applicability of common law fraud principles to securities transactions, said:

> There has . . . been a growing recognition by common-law courts that the doctrines of fraud and deceit which developed around transactions involving land and other tangible items of wealth are ill-suited to the sale of such intangibles as advice and securities, and that, accordingly, the doctrines must be adapted to the merchandise in issue. (footnotes omitted)

tent of the duty that rule 10b–5 imposes on this particular defendant. In making this determination the court should focus on the goals of the securities fraud legislation by considering a number of factors that have been found to be significant in securities transactions.

E. *The Application*

■ Although it would be inappropriate for us to attempt to set forth all of these factors, past 10b–5 cases have established many of them. Without limiting the trial court from making additions or adaptations in a particular case, we feel the court should, in instructing on a defendant's duty under rule 10b–5, require the jury to consider the relationship of the defendant to the plaintiff,[16] the defendant's access to the information as compared to the plaintiff's access,[17] the benefit that the defendant derives from the relationship,[18] the defendant's awareness of whether the plaintiff was relying upon their relationship in making his investment decisions[19] and the defendant's activity

16. *E. g.* Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir.), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967) (Class A shareholders were allowed to maintain 10b–5 action against Class B shareholders for approving an unfair merger) ; Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961) (The plaintiff need not allege genuine fraud to state a good cause of action against fellow member of a joint venture formed to acquire control of a corporation). *See* Brennan v. Midwestern United Life Ins. Co., 259 F.Supp. 673 (N.D.Ind.1966) (motion to dismiss denied), 286 F.Supp. 702 (N.D.Ind. 1968) (on merits), aff'd, 417 F.2d 147 (7th Cir. 1969), cert. denied, 397 U.S. 989, 90 S. Ct. 1122, 25 L.Ed.2d 397 (1970). The *Brennan* court said:

> Certainly, not everyone who has knowledge of improper activities in the field of securities transactions is required to report such activities. This court does not purport to find such a duty. Yet, duties are often found to arise in the face of special relationships, and there are circumstances under which a person or a corporation may give the requisite assistance or encouragement to a wrongdoer so as to constitute an aiding and abetting by merely failing to take action.

259 F.Supp. at 681–682.

17. *See, e. g.,* Schoenbaum v. Firstbrook, 268 F.Supp. 385 (S.D.N.Y.1967), aff'd 405 F.2d 200 (2d Cir.), modified, 405 F.2d 215 (2d Cir. 1968), cert. denied, 395 U.S. 906, 89 S. Ct. 1747, 23 L.Ed.2d 219 (1969). That court said:

> The fraud involved in buying or selling on the basis of inside information is based first on the user's relationship with the corporation being such as to *allow him access to information intended only for a corporate purpose*—not for his personal benefit. For the instant, we shall assume this to have been met. Secondly, the fraud rests " * * * upon the inherent unfairness involved where a party

> takes advantage of such information *knowing it is unavailable to those with whom he is dealing.*" Cady, Roberts & Co., 40 S.E.C. 907, 912 (1961). Where, as plaintiff alleges here, *both* parties had full knowledge, there is no fraud upon either party resulting from the use of this knowledge.

268 F.Supp. at 395 (footnotes omitted) (emphasis added).

18. Affiliated Ute Citizens v. United States, 406 U.S. 128, 152–153, 92 S.Ct. 1456, 31 L. Ed.2d 741 (1972). See 2 A. Bromberg, Securities Law: Fraud § 8.5(584), at 208.46–.49 (1971) for a history of the role benefit or expectation of benefit has played in 10b–5 cases where the parties were not in privity of contract.

19. In Drake v. Thor Power Tool Co., 282 F. Supp. 94 (N.D.Ill.1967), the court, holding that plaintiffs had stated a good cause of action under rule 10b–5 against an independent auditing firm that had approved false statements in the corporation's financial statements, said:

> [T]he alleged misstatements were intended for public information and to induce the public to buy securities. The defendant, in certifying financial statements, directed its activities toward investors. . . . The purpose of the financial statements is to inform the man on the street and the underlying policy of the Securities and Exchange Acts and of Rule 10b–5 is to assure that he can have truthful information in buying securities . . . . Moreover, the defendants have set themselves up to be independent certified public auditors. As such, they have assumed a peculiar relationship with the investing public. As accountants, the defendant clearly cannot be immunized from suit.

> .      .      .      .      .

> The allegations may be sustained as either an intentional misrepresentation or as a negligent misrepresentation.

in initiating the securities transaction in question.[20]

■ While giving examples in the nature of generalization is fraught with dangers, we do so by way of guidance. Where the defendant derives great benefit from a relationship of extreme trust and confidence with the plaintiff, the defendant knowing that plaintiff completely relies upon him for information to which he has ready access, but to which plaintiff has no access, the law imposes a duty upon the defendant to use extreme care in assuring that all material information is accurate and disclosed. If the defendant has breached this duty he is liable under rule 10b–5, provided the other elements of materiality, causation and damages are established. On the other hand, where the defendant's relationship with the plaintiff is so casual that a reasonably prudent person would not rely upon it in making investment decisions, the defendant's only duty is not to misrepresent intentionally material facts. Under this standard the duty to investigate and disclose material facts will necessarily vary according to the fact situation.

We believe this flexible duty standard is desirable in an area as complex as securities fraud litigation and will come more closely to improving the sanctity of information in the market place, as Congress intended, without severely hampering the trading of securities and the flow of information. The standard we have set forth here does not impose absolute liability for misrepresentations regardless of the person's knowledge of falsity. It rejects the use of latin terms which obfuscate the rule and confuse the result. It rejects the idea that conduct in complex rule 10b–5 cases may be neatly compartmentalized into traditional concepts which have often resulted in jamming facts together in an effort to fit the concept. While rejecting scienter and state of mind concepts as the standard itself, it requires the court to consider state of mind as an important factor in determining the scope of duty that rule 10b–5 imposes.

Since the trial court's jury instruction did not give weight to the factors we have here set forth, we must reverse and remand.

■ Because of our disposition of these cases, it is unnecessary for us to rule on the remaining questions raised by Abrams or the cross-appeal. However, by way of guidance for the retrial, we hold that prejudgment interest may be disallowed in this rescission action at the discretion of the trial judge. *See* Wessel v. Buhler, 437 F.2d 279 (9th Cir. 1971). However, it would have been better for the trial court to announce its determination prior to argument by counsel.

Reversed and remanded.

*Id.* at 104–105. Implicit in the court's statement is the notion that the defendants should be held to a high standard since they were aware that the investing public would rely upon the accuracy of their statements.

20. *Compare* O'Neill v. Maytag, 339 F.2d 764 (2d Cir. 1964) (Reexchange of shares between two airlines at ratio unfavorable to plaintiffs' corporation upon order of CAB did not result in 10b–5 liability for board of directors, even though the transaction was done to perpetuate the board in control) *with* Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir. 1964) (Directors' active participation in the issuance and sale of new shares to perpetuate the board in control resulted in liability under rule 10b–5) *and* Globus, Inc. v. Jaroff, 266 F.Supp. 524 (S.D.N.Y.1967) (Good cause of action under 10b–5 stated where material facts were omitted by directors in notice of shareholders meeting and directors had actively participated in plan to issue new stock that would have greatly benefited them). *See* Mann, *supra* Note 3, at 1219–20.