Gloria C. BRADSHAW, et
ux., Plaintiffs,

v.

John H. VAN HOUTEN II, et
al., Defendants.

Jacqueline D. PEABODY, Plaintiff,

v.

John H. VAN HOUTEN II, et
al., Defendants.

Gordon L. BARTON, Plaintiff,

v.

John H. VAN HOUTEN II, et
al., Defendants.

Nos. Civ 83–1096 PHX VAC to CIV
83–1098 PHX VAC.

United States District Court,
D. Arizona.

Feb. 5, 1985.

David D. Dodge, Phoenix, Ariz., for
plaintiffs.

Evans, Kitchel & Jenckes, P.C., Phoenix,
Ariz., for Merrill Lynch.

Sacks, Tierney & Kasen, Phoenix, Ariz.,
for Mehren.

Campana & Horne, Phoenix, Ariz., for
Van Houten & Continental Arizona Consultants.

## AMENDED MEMORANDUM OPINION AND ORDER

HARDY, District Judge.

Plaintiff's amended complaint in CIV 83–1098 PHX VAC alleges various federal securities law violations and pendent state claims. The defendant Merrill Lynch, Pierce, Fenner and Smith, Inc. has moved for summary judgment. The motion will be granted.

984

## FACTS

Barton, the plaintiff, inherited a substantial amount of IBM stock. On the recommendation of his lawyer, he went to the defendant Mehren, a vice president of Merrill Lynch. In the course of several discussions, Mehren persuaded Barton to permit him to manage Barton's investment. Barton delivered the IBM stock certificates to Mehren and an investment account was opened with Merrill Lynch. A cash management account was also opened, from which Barton could withdraw funds by drawing drafts on the account.

Thereafter, Mehren proceeded to sell portions of the IBM stock and to invest some of the proceeds in other securities. These investments were handled in the normal course of Merrill Lynch's business. Proceeds from the sales of securities were deposited in the cash management account. When securities were purchased for Barton, the cash management account was credited. Commissions were charged to Barton, records of the transactions were kept by Merrill Lynch and confirmation notices were given to Barton by Merrill Lynch.

Mehren introduced Barton to Van Houten, a certified public accountant, who was not an employee or officer in Merrill Lynch. Mehren told Barton that Van Houten had some excellent limited partnership investments which would be good tax shelters. Barton dealt directly with Van Houten in purchasing interests in two limited partnerships, Continental Meadows and Continental Eastpoint. Mehren also persuaded Barton to purchase an interest in a third limited partnership, Cheshire Land Trust. In each transaction, Barton paid for his interest by drawing a draft on his cash management account. These three investments are the alleged fraudulent transactions which are the basis of this action. They were not handled in the normal course of Merrill Lynch's business. Mehren testified that he deliberately did not inform any one at Merrill Lynch of these transactions because he was afraid that they would disapprove of them. Barton was aware that he was dealing with Mehren and not with Merrill Lynch.

## DISCUSSION

### 1. Sham Issue

In his deposition Barton testified that he knew that he was not purchasing Cheshire Land Trust from Merrill Lynch but rather from Mehren:

Q Isn't it fair to say, Mr. Barton, that you understood when you purchased the Cheshire Land Trust that you were purchasing them from Mr. Mehren?

A Instead of Merrill, Lynch?

Q Yes, sir.

A Yes.

■ In opposing the motion for summary judgment Barton filed an affidavit averring that he purchased the investment "because of my faith in Mr. Mehren because of his position at Merrill Lynch" and because "they were the same as far as I was concerned because I always thought Mr. Mehren acted in behalf of Merrill Lynch." It is the law in the Ninth Circuit that a party who has given a deposition under oath cannot raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony. *Lopez v. General Motors Corp.*, 697 F.2d 1328, 1333 (9th Cir.1983); *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 544 (9th Cir.1975).

### 2. Controlling Person Liability

Both the Securities Act of 1933 and the Securities and Exchange Act of 1934 have "controlling persons" provisions. Merrill Lynch is indisputably a controlling person. Section 15 of the 1933 Act, 15 U.S.C. § 77o, imposes liability upon a controlling person "unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." Here, Mehren deliberately concealed from Merrill Lynch the fact that he had referred Barton to Van Houten and the fact that he himself had

sold an interest in the Cheshire Land Trust to Barton. There is nothing to suggest that Merrill Lynch had any reasonable ground to believe in the existence of these transactions.

Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), provides that a controlling person shall be liable for violations of the Act by a controlled person "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

In *Christoffel v. E. F. Hutton and Co., Inc.*, 588 F.2d 665 (9th Cir.1978), the Ninth Circuit observed:

Although the concept of "control" used in Section 20(a) is broad, it is not unlimited. The term was not used by Congress as it is defined within the context of common law agency. Congress declined to define the term because "it would be difficult if not impossible to enumerate or to anticipate the many ways in which actual control may be exerted...." (H.R.Rep. 1383, 73d Cong., 2d Sess. 26 (1934).) Congress intended the term "control" to encompass relationships with broader variety and scope than those traditionally associated with master and servant, principal and agent. At the same time, Congress also intended a more restrictive meaning than that embraced by agency principles by also requiring some kind of participation by the controlling person in the activities of the controlled person which are claimed to be violative of the securities laws.

*Id.* at 668.

At first blush, the Ninth Circuit decisions on controlling person liability seem to be contradictory. In *Hecht v. Harris, Upham & Co.*, 430 F.2d 1202 (9th Cir.1970), the court upheld the district court's ruling that failure of the controlling person to maintain and diligently enforce a proper system of internal supervision and control constitutes participation in the misconduct. *Id.* at 1210. In *Christoffel*, the court ruled that E. F. Hutton and Co. could not be a controlling person within the meaning of

Section 20(a) because it was not a participant in the activities which were claimed to violate the securities laws. 588 F.2d at 669. In *Kersh v. General Council of the Assemblies of God*, 535 F.Supp. 494 (N.D. Cal.1982) the district court ruled that "allegations of reckless non-feasance are sufficient to state a claim of control person liability under Section 20(a) where allegations of a duty of care have been made." *Id.* at 498. The court rejected an argument that *Christoffel* overruled *Hecht* by implication because there was no allegation in *Christoffel* of a duty to supervise. *Id.* In a recent decision the Ninth Circuit stated:

This court has indicated that there can be no liability if the controlling person "was not a participant in ... activities which are claimed to violate the securities laws." [citing *Christoffel*] ... "There must be some showing of actual participation ... before the consequences of control may be imposed." *Herm v. Stafford*, 663 F.2d 669, 684 (6th Cir.1981).

*Burgess v. Premier Corp.*, 727 F.2d 826 at 832 (9th Cir.1984).

The apparent conflict in the foregoing rulings disappears when it is recognized that the duty owed by a defendant to a plaintiff in an action under the 1934 Act is gauged by a "flexible duty" standard. This standard was first enunciated in *White v. Abrams*, 495 F.2d 724 (9th Cir. 1974). The court held that in determining a defendant's duty, consideration should be given to, among other things, "the relationship of the defendant to the plaintiff, the defendant's access to the information as compared to the plaintiff's access, the benefit that the defendant derives from the relationship, the defendant's awareness of whether the plaintiff was relying upon their relationship in making his investment decisions and the defendant's activity in initiating the securities transaction in question." *Id.* at 735–36 (footnotes omitted).

The Court pointed out:

By adopting such a duty analysis, we avoid the confusion that arises from classifying the defendants as primary and secondary, or from classifying the trans-

actions as direct and indirect. This flexible approach, as compared to the compartmentalized approach, does away with the necessity of creating a separate pigeonhole for each defendant whose involvement in the transaction in question may not fit nicely into one of the previously defined classes.

*Id.* at 734.

It has been argued that in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court dealt a death blow to *White v. Abrams. See Spectrum Financial Companies v. Marconsult, Inc.,* 608 F.2d 377, 383 (9th Cir.1979) (Ferguson, D.J., concurring specially). The Ninth Circuit noted in *Zweig v. Hearst Corp.,* 594 F.2d 1261 (9th Cir.1979), however, that while *Ernst & Ernst* partially overruled *White v. Abrams,* "its approach to the duty question is otherwise the law of this circuit." *Id.* at 1268 n. 13. *See also Spectrum Financial Companies,* 608 F.2d at 381.

*Hecht* was a churning case. Between 1957 and 1965 the Hecht account was among the most actively traded in Harris, Upham's San Francisco office and was among the most lucrative in terms of commissions and interest. Contrary to recognized good standards of practice in the brokerage business and to Harris, Upham's own policies, the resident partner in the office where Hecht's accounts were maintained made no inquiry to determine the propriety of investments made in behalf of Hecht and did nothing to supervise the activities of its account broker. *See Hecht v. Harris, Upham & Co.,* 283 F.Supp. 417, 438–39 (N.D.Cal.1968). The Ninth Circuit affirmed the district court's finding that, because of this failure, Harris, Upham could not be said to have acted in good faith and had indirectly inducted the churning. *See Hecht,* 430 F.2d at 1210.

In *Christoffel,* the account executive had been appointed by the Superior Court in Arizona as the guardian of his customer. The brokerage firm gave its permission, subject to the express stipulations that the executive would supply the firm with court authorizations for all transactions conducted by him through the brokerage firm as guardian for the estate, that he would receive no commission or other compensation from the brokerage firm of such security transactions and that he would supply the firm with yearly court-approved accountings of his transactions as guardian. In the course of the guardianship, the account executive embezzled guardianship funds. The court concluded that in doing so, he was not acting as a controlled person and that the brokerage firm could not therefore be a controlling person. *See Christoffel,* 588 F.2d at 668–69.

In *Burgess,* five doctors brought an action against a corporation and its directors for securities fraud arising from the sale of tax shelter investments in cattle herds. Three of the directors had also been officers of the corporation. The other two, Shrock and Darby, had not. A judgment was obtained against all five defendants. On appeal, the judgment was affirmed as to the corporation and three of the directors but was reversed as to Darby and Shrock. It was held that they were not controlling persons because they had not participated in the day to day operations of the corporation and had no contact with any of the doctors. *See Burgess,* at 832–33.

While the Ninth Circuit did not expressly apply the flexible duty standard in *Hecht, Christoffel* or *Burgess,* the existence of the standard explains why inaction was sufficient to impose Section 20(a) liability in *Hecht* but not in *Christoffel* or *Burgess.*

█ Applying a flexible duty standard in this case, it is clear that Merrill Lynch cannot be held liable as a controlling person. In two of the three transactions which are the basis of this action, Barton dealt directly with Van Houten. In the third he knew that Mehren was not acting for Merrill Lynch but for himself. Merrill Lynch was not even aware of the transactions and derived no benefit from them. Barton may have been relying upon Mehren's relationship with Merrill Lynch in making his investment decision but Merrill Lynch could not have been aware of that

reliance since the transactions were concealed by Mehren. Finally, of course, Merrill Lynch had nothing to do with initiating the transactions.

3. *Rescission*

In responding to Merrill Lynch's motion for summary judgment, Barton argued that he was entitled to rescind all contracts entered into with Merrill Lynch pursuant to the provisions of Section 29(b) of the 1934 Act, 15 U.S.C. § 78cc(b). However, the amended complaint alleges only that the three transactions discussed above were in violation of the securities laws. There is no allegation that any transaction Mehren handled on behalf of Barton through Merrill Lynch was fraudulent.

4. *Additional Discovery*

Barton has requested that Merrill Lynch's motion for summary judgment be held in abeyance pending additional discovery relating to Merrill Lynch's employee supervision policies. If the transactions in question had been handled in the normal course of Merrill Lynch business, the request would be well taken, but they were not.

IT IS ORDERED granting Merrill Lynch's motion for summary judgment.