Reuben P. HUGHES, Plaintiff-Appellant,

v.

DEMPSEY–TEGELER & CO., INC., a
Delaware Corporation, et al.,
Defendants-Appellees.

No. 73–3591.

United States Court of Appeals,
Ninth Circuit.

March 29, 1976.

Rehearing and Rehearing En Banc
Denied June 4, 1976.

Angelo J. Palmieri (argued), of Kindel & Anderson, Los Angeles, Cal., for plaintiff-appellant.

Irwin F. Woodland (argued), of Gibson, Dunn & Crutcher, Los Angeles, Cal., Edward J. Reilly (argued), of Milbank, Tweed, Hadley, & McCloy, New York City, Don F. Tyler (argued), of Wlaker, Wright, Tyler & Ward, Los Angeles, Cal., for defendants-appellees.

## OPINION

Before TRASK and SNEED, Circuit Judges, and RENFREW,[*] District Judge.

RENFREW, District Judge:

This is an appeal from the judgment of the district court below dismissing plaintiff's action following trial to the court. Plaintiff-appellant is Reuben P. Hughes ("Hughes"), a businessman and private investor whose business activities include serving as a director and officer of Reynolds Industries and as a director of El Camino Bank in Anaheim, California. Defendant-appellee Dempsey-Tegeler & Co., Inc. ("Dempsey") was a Delaware corporation engaged in the general business of a broker-dealer in securities as a member organization of the New York Stock Exchange. Defendant-appellee Lewis Whitney ("Whitney"), was an officer of Dempsey during the period relevant to this action. Defendant-appellee New York Stock Exchange, Inc. ("Exchange") is a New York nonprofit corporation registered as a national securities exchange with the Securities and Exchange Commission.

Hughes sued defendants below in an attempt to recover losses he sustained when securities subordinated by him in favor of Dempsey were sold for the benefit of Dempsey's creditors when that firm was liquidated. He alleged that he had been induced to enter into the subordination agreement because of various misrepresentations and failures to disclose material facts by the defendants. He further alleged that the Exchange had breached its duty to enforce its rules against Dempsey and that his loss was an actual and proximate result of that breach.[1] Following trial the district court issued an extensive memorandum opinion dismissing Hughes' action. *Hughes v. Dempsey-Tegeler & Co., Inc.* [1973 Transfer Binder] CCH Fed.Sec.L. Rep. ¶ 94,133 (C.D.Cal.1974).

In his appeal Hughes has challenged the holding of the district court on each of the theories of recovery under the federal statutes set out in his complaint.[2] In our view,

---

[*] The Honorable Charles B. Renfrew, United States District Judge for the Northern District of California, sitting by designation.

1. Hughes' complaint alleged claims based upon the Securities Act of 1933, the Securities Exchange Act of 1934, California statutory law, and the common law. The first claim alleged a violation of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j, of Rule 10(b)–5 promulgated thereunder, and of Sections 12(2) and 17 of the Securities Act, 15 U.S.C. §§ 77*l*(2) and 77q by Dempsey, Whitney and defendant James Walraven (who was dismissed before trial). The second claim alleged a violation of Section 29(b) of the Securities Exchange Act, 15 U.S.C. § 78cc(b), and of Section 12(2) of the Securities Act by Dempsey and sought rescission of the subordination agreement between Hughes and Dempsey based on the violations by Dempsey alleged in the first claim. The third, fourth, and fifth claims alleged violations by the Exchange of Section 6 of the Securities Exchange Act, 15 U.S.C. § 78f, Section 10(b) of the Securities Exchange Act, Rule 10(b)–5, and Sections 12(2) and 17 of the Securities Act. The sixth claim sought declaratory

relief against the Exchange. The seventh claim alleged a violation of Section 1710 of the California Civil Code, and of Section 25401 of the California Corporations Code by Dempsey.

2. Hughes has raised the following issues on this appeal:

1. Whether the Exchange violated its statutory obligation and "agreement" under Section 6 of the 1934 Act by failing to suspend Dempsey prior to Hughes' subordination.

2. Whether the Exchange violated its statutory obligation and "agreement" under Section 6 of the 1934 Act by lifting all discipline from Dempsey on or about March 19, 1970, prior to Hughes' subordination.

3. Whether the Exchange, Dempsey, Whitney or Walraven violated Sections 12(2) or 17(a) of the 1933 Act, Section 10(b) of the 1934 Act or Rule 10b–5 by making or participating in material or misleading representations affecting Hughes' subordination.

4. Whether the Exchange, Dempsey, Whitney or Walraven violated Sections 12(2) or 17(a) of the 1933 Act, Section 10(b) of the 1934 Act or Rule 10b–5 by breaching an affirmative duty to disclose all material facts to Hughes.

we need only address three basic questions to resolve this appeal. First, did the district court apply the correct legal standard in determining whether the Exchange had satisfied the duty imposed upon it by Section 6 of the Securities Exchange Act, and, if so, was its application of that standard to the facts sustainable on appeal? Second, assuming that the Exchange did breach its duty under Section 6, is Hughes precluded for any reason from recovering damages sustained as a result of that breach? Third, and finally, was the district court's finding that Hughes had received complete disclosure of all the material information concerning his subordination decision clearly erroneous?

We affirm the court below but for reasons different than those set out in its memorandum of opinion.

## FACTS

The allegations in Hughes' complaint, particularly those against the Exchange, require that the focus of this opinion extend considerably beyond the subordination agreement between Hughes and Dempsey. In order to facilitate the presentation of the complex factual setting of this case, the relevant events are discussed in three phases. First, the developments in the securities industry during the relevant period are sketched. Then, the particular problems facing Dempsey and the responses to those problems by the principal actors are described. Finally, the series of events leading up to the execution of the subordination agreement by Dempsey and Hughes is examined. Although these phases have been isolated for purposes of exposition, they in fact constitute an interwoven fabric.

The chaotic condition of the securities industry in this country in the late 1960s and early 1970s provides the primary backdrop for this case. Between 1964 and 1969 stock market trading volume more than doubled, but the ability of brokerage firms to process their transactions failed to keep pace. Because the securities industry operated through the actual physical transfer of securities, problems at one brokerage house soon spread to other houses. Initially, this crisis was an operational one in which accounting systems broke down under the volume of business. However, the operational crisis frequently engendered financial problems. Because brokerage houses obtain part of their operating capital from the cash and securities they hold for customers, the confusion in accounting and the physical loss of securities deprived the firms of the use of capital which would otherwise have been available.

The problems of the securities industry were severely compounded by a precipitous decline in stock prices beginning at the end of 1968. By May of 1970, the Dow-Jones Industrial Average had fallen 354 points from the high of 985.2 reached late in 1968. The decline in stock prices adversely affected brokerage houses in two ways. First, those firms whose capital reserves were in the form of securities suffered a loss of capital as the value of the securities declined. Second, a decrease in trading volume accompanied the price decline, seriously cutting into the commission income of the brokerage houses.[3]

It is against this grim background that the particular situation facing Dempsey and the responses of the various parties must be assessed. That Dempsey was especially

5. Whether the Exchange violated Section 17(a) of the 1933 Act, Section 10(b) of the 1934 Act and Rule 10b–5 by participating in a course of business that operated as a fraud on Hughes.

6. Whether the Exchange violated Section 15 of the 1933 Act or Section 20(a) of the 1934 Act by failing to prove it acted in good faith to prevent the fraud on Hughes by Dempsey, Whitney and Walraven.

7. Whether the Exchange participated in, aided or abetted the federal securities violations of Dempsey, Whitney or Walraven.

8. Whether the District Court's finding that Hughes had actual knowledge of all material facts affecting his subordination was clearly erroneous.

3. This summary is drawn in large part from a student note describing the problems of the securities industry during this period: Note, "Exchange Liability for Net Capital Enforcement", 73 Colum.L.Rev. 1262 (1973).

hard hit by the problems facing the industry in general is not disputed. Dempsey used an internal accounting practice based upon a method of branch office reporting to various regional accounting centers. The district court found that "[t]his particular accounting operation coupled with marked deficiencies in managerial leadership were to make Dempsey particularly vulnerable to the dramatic vicissitudes which were to affect adversely the securities market in the late sixties." *Hughes, supra,* at 94,527.

The Exchange's involvement with Dempsey spanned a number of years. Because of violations of the Exchange's capital and record-keeping rules in 1964 and 1965, the Exchange had required Dempsey to centralize its accounting operations. When difficulties were encountered in effecting this change, Dempsey received permission to use two accounting centers. However, as late as December 1968, Dempsey continued to use a third accounting center in St. Louis. *Id.* at 94,527.

The series of events directly relevant to this case began on January 16, 1969, when the surprise 1968 audit of Dempsey by Haskins & Sells was received by the Exchange. In contrast to the preceding report which had apparently indicated no problems, this audit revealed "serious capital and accounting problems in violation of Exchange rules." *Id.* at 94,528. In response to the news of these violations, the Exchange invoked what the district court characterized as "a measured response against Dempsey by levying certain sanctions against its business and management", including a prohibition against advertising or adding more registered representatives, a limitation on the maximum number of weekly trades, and a requirement of an immediate infusion of capital. *Id.* Furthermore, in a consent to penalty signed April 15, 1969, the Exchange imposed fines on Dempsey and two of its top officials. Additionally, the consent included an agreement to resolve the firm's accounting and record-keeping problems by September 30, 1969. Failing that resolution, the firm was to be subjected to further reduction so that only one accounting center could be used. In the event that such a reduction was required but not achieved, the firm was to be removed from the Exchange.

On September 18, 1969, Haskins & Sells released its audit of Dempsey as of June 1, 1969. *Id.* There can be no doubt about the seriousness of that report, revealing as it did a deteriorating situation with respect to every important measure of Dempsey's operational and financial condition. The district court noted that Haskins & Sells had "pointedly avoided the issuance of an unqualified opinion with respect to Dempsey's financial condition." *Id.* The court further stated that Dempsey's unresolved " 'short stock record differences' [indicating missing securities the owners of which are known] * * * exclusive of subordinate borrowings were 213.46 percent of its stated net worth, the worst in the industry, and placed that firm perilously close to insolvency in the event such differences were incapable of being resolved." *Id.* at 94,529.

Following the release of the Haskins & Sells audit on September 18, a meeting attended by representatives of the Commission, the Exchange, and Dempsey was held in New York on September 25 to discuss Dempsey's noncompliance with the Exchange's directives. The Exchange refused to extend the September 30 deadline. Therefore, pursuant to the April consent to penalty, Dempsey was ordered to retract its business so that one accounting center could be used. Shortly thereafter, Dempsey's President, Jerome Tegeler, was suspended by the Exchange for a year, and Lewis Whitney was named by Dempsey to be president of the firm. Further restrictions were imposed by the Exchange by letter on October 23. Dempsey was ordered to close 50% of its branches and to prepare a schedule for the elimination of the accounting and record-keeping problems still facing it. At the same time, the Commission refused to approve any further underwritings by Dempsey. After this time, no further restrictions or penalties were imposed on Dempsey.

On October 24, 1969, another meeting was held by representatives of the Exchange, the Commission and Dempsey. The district court found that strong disagreement emerged at this meeting among some of the participants concerning the appropriateness of the response to Dempsey's problems, with the representatives of the Exchange prevailing over representatives of the Commission as to the severity of the sanctions to be imposed. The Exchange announced that it would not make its discretionary Trust Fund available to customers and creditors of Dempsey in the event that the Commission forced the firm into liquidation proceedings. The meeting concluded with the understanding that Dempsey would not be suspended and that the Exchange's program of restrictions would be continued.

There were further meetings and exchanges of letters among the representatives of the Exchange, the Commission, and Dempsey in the last part of 1969 and the first part of 1970. In March of 1970, as part of an understanding reached with the suppliers of new capital for Dempsey, the Exchange lifted its previously imposed restrictions from Dempsey. At the same time, the Commission agreed to lift its prohibition against new underwriting by Dempsey.

Turning now to the sequence of events by which Hughes became involved with Dempsey, it is appropriate to give a brief description of Hughes himself. The district court described Hughes as "an uncommon man, with an uncommon business acumen", *id.* at 94,526, an accolade which is apparently justified by Hughes' business accomplishments. Hughes was the motivating force behind Pacific Hawaiian Products Company (producer of "Hawaiian Punch"), a company which he led from very modest beginnings to great financial success. The district court summarized Hughes' position in the business community at the time of the events in this case as follows:

"By the spring of 1969, Pacific Hawaiian had merged with Reynolds Tobacco, subsequently named Reynolds Industries.

Hughes became its largest individual shareholder, a member of the Board of Directors, and an officer of that organization. Hughes also became a director of the El Camino Bank in Anaheim, California, and of the Anaheim Stadium Corporation. In 1967, Hughes received the "Business Man of the Year Award" in Orange County. His net worth was $11,000,000.00, and his yearly income by 1969 from investments was at least $300,000.00." *Id.*

Hughes' contact with Dempsey began more than twenty years ago when he opened a securities account with the firm after solicitation by James Walraven. At about the same time, Hughes became acquainted with Whitney, then a general partner of Dempsey. The district court found that Walraven was not only a professional consultant to Hughes, but also his personal friend. Whitney later became a director of Pacific Hawaiian. Dempsey handled the two public offerings of Pacific Hawaiian stock which occurred between 1955 and 1964.

Hughes' involvement with the attempted resolution of Dempsey's problems began early in 1969 when Walraven suggested that Hughes subordinate a substantial amount of securities to Dempsey to be used in meeting the Exchange's net capital requirements. In exchange for the use of his securities, Hughes was to be paid substantial interest on their face amount by Dempsey, while retaining the right to collect the interest and dividends paid by the issuers of the securities. On the advice of his personal attorney, Hughes elected to postpone further consideration of the matter until the Haskins & Sells audit of June 1969 could be reviewed. When that somber report was issued, Hughes was sent a copy which was in his possession at all subsequent, relevant times.

Late in 1969, Dempsey began negotiations concerning a separate subordination agreement with John King, chief executive and primary stockholder of King Resources Corporation, a holding company with substantial assets. This proposed subordina-

tion agreement, like the one being negotiated with Hughes, represented an effort to obtain the capital which was one of the essential requirements for Dempsey's return to viability. King initiated a private in-depth investigation of Dempsey in order to assess the desirability of subordinating $7,000,000 in King Resources stock in favor of Dempsey. Although Hughes never read the report prepared for King, it is important to note that Walraven suggested to Hughes that he might want to discuss the question of subordination with King and even offered to make arrangements for Hughes' transportation. Although this offer was not accepted by Hughes, the negotiations between Dempsey and King were clearly a substantial factor in Dempsey's continuing negotiations with Hughes. Hughes was impressed that King, whose business judgment Hughes valued, was also considering a subordination agreement. Hughes had realized extensive profits from previous investments in King stock.

There were three principal meetings between Hughes and the representatives of Dempsey. In December of 1969 Hughes met with Walraven and Whitney to discuss the possibility of a subordination agreement. At that time, Whitney advised Hughes not to commit himself unless King followed through on his agreement. In February of 1970 Hughes met with Walraven and Whitney again, at which time Dempsey's operating problems were specifically raised and discussed. Whitney told Hughes that it appeared that the King subordination would occur if, *inter alia,* all restrictions were lifted from Dempsey. Hughes authorized extensive negotiations between his securities counsel and Dempsey's outside counsel in St. Louis over the nature and structure of such a subordination agreement.

In February 1970, at the same time that Hughes was meeting with Walraven and Whitney, representatives of King, the Commission, and the Exchange met to discuss the King subordination. King had at first insisted that all restrictions be lifted from Dempsey prior to his subordination and that the Exchange certify that the loan would bring the firm into capital compliance. This demand was rejected by the Exchange, but an agreement was subsequently reached that the restrictions would be lifted after the subordination was effected. After the February meeting, the Commission expedited the registration of the King stock, knowing that it was to be used for the Dempsey subordination. King executed his subordination agreement with Dempsey on March 19, 1970.

The third and final meeting between Hughes and the Dempsey representatives occurred on March 23, 1970, the day before the execution of Hughes' subordination agreement. In addition to Walraven and Whitney, this meeting was attended by Robert Peck, an executive vice president of Dempsey who had been employed specifically to formulate a plan to save Dempsey, and Slavik Uhlir, an accounting expert employed by Dempsey to assist with its operational problems. At this meeting Walraven and Whitney "conveyed an optimistic appraisal of Dempsey's dilemmas" and of the safety of Hughes' proposed subordination. *Id.* at 94,535. However, Peck gave a lengthy oral and documentary presentation which specifically disagreed with the optimism of Walraven and Whitney and detailed the problems facing Dempsey and the circumstances that would have to materialize if the firm were going to survive. He plainly informed Hughes that there was a substantial risk in the contemplated investment, and there was a "good chance" that he would lose his money if he went ahead with the subordination. The district court found that with respect to Peck's warnings, "Hughes just either dismissed them lightly, or decided to ignore them entirely." *Id.* at 94,536.

The next day, March 24, 1970, Hughes executed the documents of the subordination agreement upon notification that the King loan had been consummated and that the restriction against Dempsey had been lifted.

The stock market experienced severe losses immediately after the King and Hughes

subordinations. The district court summarized this decline and its particular impact on Dempsey as follows:

"The New York Stock Exchange Index declined by approximately 25 percent, the American Stock Exchange and over-the-counter averages declined by substantially greater amounts. The stock securing the King loan dropped from $23 per share in March 1970 to approximately $6 per share at the end of May 1970. On April 30, its market value had been $5.5 million ($14 per share); by May 22, its net value had declined to $2.7 million. By July 1970, there was no market for the King stocks, the market value had fallen to $1.50 per share. The precipitous decline of the stock market in general, and the King stock in particular, was disastrous for Dempsey." *Id.* at 94,536–94,537.

The decline in securities value was also accompanied by a marked drop in volume of securities traded. The combined effect of these developments was fatal to Dempsey. On or about July 15, 1970, Hughes' subordinated securities were sold as provided in the subordination agreement. The liquidation of Dempsey was begun on August 7, 1970, when a liquidation agreement between Dempsey's voting stockholders and the Exchange was executed. As a result of his subordination, Hughes lost $1,271,600. The suit below followed.

## THE EXCHANGE'S BREACH OF DUTY UNDER SECTION 6 OF THE SECURITIES EXCHANGE ACT

Hughes based his third, fourth and fifth claims below on the alleged violation by the Exchange of the duties imposed on it by Section 6 of the Securities Exchange Act, 15 U.S.C. § 68f.[4] Hughes argues that two distinct decisions taken by the Exchange in response to Dempsey's problems constituted

a violation of its duty under that section: first, the decision not to suspend the firm in the fall of 1969 but instead to continue with the program of more limited restrictions; and second, the decision to lift the previously imposed restrictions from Dempsey in March of 1970 as part of the effort to attract additional capital for the firm. The district court held that the Exchange had not breached the duty imposed on it by Section 6. Hughes challenges that conclusion.

Section 6 sets out the conditions for the registration of securities exchanges under the Securities Exchange Act. Applicant exchanges are required to submit their constitutions, articles of incorporation, and all other rules "whatever the name" so that the Commission can determine whether they are "just and adequate to insure fair dealing and to protect investors". Two provisions of Section 6 are of particular importance to a private cause of action such as Hughes'. First, Section 6(a)(1) requires the applicant exchange to submit:

"An agreement (which shall not be construed as a waiver of any constitutional right or any right to contest the validity of any rule or regulation) to comply, and to enforce so far as is within its powers compliance by its members, with the provisions of this chapter, and any amendment thereto and any rule or regulation made or to be made thereunder".

Second, Section 6(b) establishes both a condition precedent and subsequent to the registration of any exchange:

"No registration shall be granted or remain in force unless the rules of the exchange include provision for the expulsion, suspension, or disciplining of a member for conduct or proceeding inconsistent with just and equitable principles of

---

4. Although they have not pursued the point with any vigor, appellees have argued in their brief that Hughes lacks standing to bring a private right of action under Section 6. The basis of this argument is that Section 6 was intended to protect customers of brokerage firms such as Dempsey, and not to protect investors in such firms themselves. We agree with the careful analysis of this question in *New York Stock Exchange v. Sloan,* 394 F.Supp. 1303 [1974–75 Transfer Binder], CCH Fed.Sec.L.Rep. ¶ 95,083 (1975), in which Judge Lasker held that the legislative history and policy of the statute supported a finding that both subordinated lenders and limited partners were entitled to bring private actions for violations of Section 6.

trade, and declare that the willful violation of any provisions of this chapter or any rule or regulation thereunder shall be considered conduct or proceeding inconsistent with just and equitable principles of trade."

Shortly after the enactment of the Securities Exchange Act, the Exchange complied with the requirements of Section 6 and was granted registration under the Act by the Commission.

 The Securities Exchange Act provides no express remedy for individuals who suffer loss as a result of an exchange's failure to enforce its rules. It is, however, well established that Section 6 does impose a duty upon an exchange to enforce the rules adopted pursuant to Section 6 and that a private right of action will lie to seek damages for injuries suffered as a result of an exchange's violation of that duty.[5] This appeal requires us to consider the dimensions of that duty when an exchange is aware of a violation of the Act or of its rules.[6] It is undisputed that Dempsey was in intermittent violation of the Exchange's net capital and reporting rules as early as 1964, and, more importantly, in continuous, serious violation of those rules from at least June of 1968 until its liquidation in August of 1970. The question is whether the Exchange's response to that known situation fell short of the obligations imposed by Section 6.

Hughes argues that the district court erred in taking into consideration certain factors that are inappropriate to an appraisal of the Exchange's duty under Section 6. Although the district court's opinion in this case of first impression reflects scholarship and prodigious effort, we are nevertheless convinced that with regard to the Exchange's decision to lift the ' restrictions from Dempsey the district court erred in finding no breach.

 The district court discussed the question of the Exchange's Section 6 liability at several different points in its lengthy opinion. At one point, the court stated that the measure of the Exchange's Section 6 duty "depends to a certain extent upon Hughes' status, and to a greater extent, upon the nature and amount of information to which Hughes had access—or to which he should have had access." *Id.* at 94,539. We agree with Hughes that the extent of his information is irrelevant to the question of whether the Exchange has breached its duty to enforce its own rules. The question of Hughes' access to information is, however, a proper consideration in determining whether Hughes should be allowed to recover for any breach of the Exchange's duty which has occurred. At another point, the district court discussed the action taken by the Exchange and found that it had been taken in a "good faith effort to do principally two things: (1) rescue Dempsey, and thereby protect its creditors; and (2) pre-

**5.** Private suits have been allowed against exchanges for violation of Section 6 on two legal theories. The first, established by the leading case of *Baird v. Franklin,* 141 F.2d 238 (2 Cir.), *cert. denied,* 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944), is essentially a tort theory in which the duty element is supplied by § 6(b) of the Act. The second theory, suggested in the *Baird* case, *supra,* and subsequently adopted in *Weinberger v. New York Stock Exchange,* 335 F.Supp. 139 (S.D.N.Y.1971), is that the private plaintiff can sue as a third party beneficiary of the agreement required by § 6(a) of the Act between the registered exchange and the Commission. In our view, the content of that duty is the same under either of the two theories.

The Supreme Court has, of course, recently handed down several decisions bearing on the question of whether a private right of action is to be implied under a statute which does not

expressly provide for such a right of action. *See Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *Securities Investor & Protection Corp. v. Barbour,* 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975). The parties have not argued and we find no reason to conclude that the factors enunciated in those decisions mandate a reversal of the longstanding rule that a private right of action is available under Section 6.

**6.** There is surprisingly little case authority on this question. Almost all reported cases involving Section 6 have turned on the question of whether the defendant exchange knew or should have known of the alleged violations of the Act or its rules. *See, e. g., Hochfelder v. Midwest Stock Exchange,* 503 F.2d 364 (7 Cir. 1974); *Butterman v. Walston,* 387 F.2d 822 (7 Cir. 1967), *cert. denied,* 391 U.S. 913, 88 S.Ct. 1806, 20 L.Ed.2d 652 (1968).

vent a general market loss of confidence, and thereby protect other firms within its responsibility." *Id.* at 94,544. The finding clearly represented a rejection of Hughes' argument that the Exchange had acted in a bad faith attempt to protect its own Trust Fund assets. Standing alone, the fact that the Exchange acted in good faith is not a sufficient defense against an action brought under Section 6. As we discuss at more length below, the concern by the Exchange regarding the consequences of its action in the general securities market is perfectly legitimate and appropriate. When the district court actually decided whether the Exchange's action constituted a breach of its duty, it used entirely different terminology. Discussing the decision not to suspend Dempsey in the fall of 1969, the court found the decision was not "unreasonable", particularly in light of the Exchange's desire both to save Dempsey and to avoid a general loss of confidence in the market. *Id.* at 94,546. This characterization of the standard in terms of reasonableness is similar to the approach we have adopted. It is not entirely clear whether the district court used the same standard in finding no breach in the Exchange's decision to lift the restrictions, a decision described by the court as "momentous [but] not an abuse of discretion, nor a violation of a statutory charge." *Id.*

Hughes has challenged the district court's determination that an exchange has some discretion or flexibility in performing its duty under Section 6. The district court clearly rejected the argument that an exchange has discretion as to whether to enforce its rules at all. Its apparent willingness to allow some flexibility in the Exchange's determination of the appropriate response to a perceived violation of the rules is consistent with the approach we have adopted. There is, however, some indication that the district court may have perceived the options open to it too narrowly. It concluded its dismissal of Hughes' Section 6 claim by stating that:

> "A contrary finding under the section 6 theory of recovery would appear to place national securities exchanges in an impossible position of making an ultimate choice between two alternative courses of action—either to submit themselves to a form of strict liability for the potential risks inherent in the type of protective scheme devised to preserve Dempsey, ·or to forego equally important obligations—legal and ethical—to other members of their national organizations and their clients." *Id.*

We believe that the approach we have adopted below allows for the imposition of liability when an exchange has clearly breached its duty without creating the dilemma which concerned the district court.

Because of the importance and complexity of the issues involved in a suit based on a violation of Section 6, we feel that it is useful to set out at some length our view of the appropriate standards. The only previous appellate consideration of the question now before us is the leading case of *Baird v. Franklin*, 141 F.2d 238 (2 Cir.), *cert. denied*, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944). In that case, Richard Whitney, the senior partner in a New York Stock Exchange member firm, had wilfully converted to his own use a large number of securities which had been entrusted to him. Between November of 1937 and March of 1938, the Exchange had knowledge of Whitney's misdeeds but took no action against him. When Whitney's firm eventually failed, the owners of the securities which had been converted brought suit for their loss. The majority of the Court of Appeals for the Second Circuit affirmed the district court's dismissal of the complaint on the ground that the plaintiffs had failed to meet their burden of proving that the Exchange's violations were the cause of their loss. 141 F.2d at 239. Judge Clark dissented, taking a somewhat more liberal position regarding the proof of damages. More importantly, his opinion is recognized as the dispositive analysis of the Exchange's duty and breach of duty under Section 6.

Judge Clark noted that one of the aims specified in the Constitution of the Exchange was the promotion of "just and equitable principles of trade and business, and

[that] any violation of this aim was punishable by expulsion from the Exchange." *Id.* at 241–242. This general aspiration was in turn defined in the constitution by reference to the particular provisions of the Act and the Exchange's rules. Judge Clark specifically listed the rules which Whitney had violated and concluded that:

"The Stock Exchange, therefore, was under a duty on November 24, 1937, to take disciplinary action against Richard Whitney for the various violations of the Securities Exchange Act and the Rules of the Exchange which it either knew of or at least had reasonable cause to suspect. Its *complete inaction* for some two months was a dereliction of that duty and a violation of § 6(b) of the Act." *Id.* at 244 (emphasis added).

*Baird* is of limited utility in the resolution of the instant appeal. As the district court below noted, in *Baird* the Exchange had assumed a role of "relatively total inaction" with regard to the violations. In contrast, in the instant case the Exchange "engaged in a carefully measured response with respect to the member firm, Dempsey, which *did* involve the invocation of *some* internal disciplinary action prior to the introduction of the claimant, Hughes, upon the scene * * *." *Hughes, supra,* at 94,545, emphasis in original. In *Baird,* Judge Clark did not have to consider the more difficult question of the sufficiency of an attempted response.

The only case to consider the question of when a positive response to a known violation of the act or rule is so inadequate as to constitute a violation of Section 6 is *Rich v. New York Stock Exchange,* 379 F.Supp. 1122 (S.D.N.Y.1974), *rev'd on other grounds,* 522 F.2d 153 (2 Cir. 1975). The case in-

volved the demise [7] of Weis Securities, Inc. ("Weis"), another member firm of the New York Stock Exchange. Placing special reliance on the Exchange's failure to enforce the net capital requirement of Rule 325, one of the rules also at issue in the instant case, plaintiffs alleged that the action taken by the Exchange after learning of Weis' financial difficulties constituted a breach of its duty under Section 6.

■ Having assumed that a private right of action would lie under Section 6 for a failure to enforce Rule 325, the court held that: "The duty of the Exchange * * * to enforce compliance with its rules 'so far as within its powers' must be evaluated reasonably." 379 F.Supp. at 1126. The court found that:

"From the time the Exchange received notice of Weis' difficulties it acted with dispatch to discharge its statutory duties. The Exchange first conducted an intensive investigation and then approved a plan which called for a merger with Ladenburg, a stronger firm, preceded *pendente* by a transfer of some accounts from Weis to Ladenburg. [Footnote omitted.] The Exchange did not select the accounts to be transferred. Its procedure was in accordance with practices the SEC has acknowledged to be a proper and effective means of salvaging firms facing financial ruin. Had it been successful, no customers of Weis would have been damaged or inconvenienced in any way." *Id.* at 1127.

On the basis of those findings, the court concluded that: "The Exchange's efforts to aid Weis did not constitute a failure to fulfill its obligations." *Id.* at 1128. The court's approach in *Rich* is inconsistent with appellant's argument in the instant case

7. In *Rich* the Securities Investors Protection Corporation ("SIPC"), an entity created by Congress in 1970 in response to the problems of the securities industry exemplified by the instant case, had petitioned the district court for liquidation of Weis and for the appointment of a SIPC trustee. A trustee was appointed, and he proceeded to resolve the claims of the customers of Weis. (For a description of the SIPC procedure, see note 8, *infra.*) Because of the existence of the SIPC, the only apparent

loss to customers was either the deprivation of their securities for a time or the necessity of taking cash rather than their actual securities. The case actually came before the court on defendants' motion for summary judgment on the ground that plaintiffs had no provable damages. In an unusual decision, the court held that it did not have to reach the damage issue which was properly before it, because "no cause of action exists in plaintiffs' favor." 379 F.Supp. at 1125.

that the response mandated by Section 6 was the immediate suspension of the firm by the Exchange upon learning of the violations. We concur in the wisdom of that court's approach.

Section 6 of the Securities Exchange Act imposes a duty upon registered exchanges to enforce the provisions of the Act and the rules promulgated pursuant to it. To hold that registered exchanges have discretion as to whether those rules will be enforced would leave the exchanges in the societally unacceptable status of private clubs which existed before the passage of the Act. *Silver v. New York Stock Exchange*, 373 U.S. 341, 351, 83 S.Ct. 1246, 1253, 10 L.Ed.2d 389, 396 (1962). While completely discretionary enforcement is an unacceptable interpretation of Section 6, so too is the inflexible position urged by appellant. Because the securities industry is a critical and sensitive part of our economic structure, the Exchange's regulatory approach should properly include an overview of the potential effects of its action. Flexibility in regulatory response is critical if the response is to be appropriate to the situation. The analysis of the United States Supreme Court in *Securities Investor Pro-*

*tection Corp. v. Barbour,* 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975), demonstrates the importance of flexibility in the regulation of the securities industry. That case required the Court's interpretation of the Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa, *et seq.,* an act established to provide statutory protection for customers of failing broker-dealers such as Dempsey.[8] The precise question before the Court was whether an implied private right of action existed by which an individual might petition a district court to determine if the statutory conditions requiring liquidation existed. The Court refused to imply such a private right of action. For our purposes the importance of the Court's analysis is in its emphasis on the policy considerations open to Securities Investor Protection Corporation ("SIPC") in deciding whether to petition for liquidation:

"The SIPC properly treats an application for the appointment of a receiver and liquidation of a brokerage firm as a last resort. It maintains an early warning system and monitors the affairs of any firm that it is given reason to believe may be in danger of failure. Its experience to date demonstrates that more of-

**8.** The Court described the SIPC procedure as follows:

"To this end, the SIPC is required to establish and maintain a fund for customer protection by laying assessments on the annual gross revenues of its members. The SEC and the securities industry self-regulatory organizations are required to notify the SIPC whenever it appears that a member is in or approaching financial difficulty. If the SIPC determines that a member has failed or is in danger of failing to meet its obligations to customers, and finds any one of five specified conditions suggestive of financial irresponsibility, then it 'may apply to any court of competent jurisdiction . . . for a decree adjudicating that customers of such member are in need of the protection provided by [the Act].' 15 U.S.C. § 78eee(a)(2). "The mere filing of an SIPC application gives the court in which it is filed exclusive jurisdiction over the member and its property, wherever located, and requires the court to stay 'any pending bankruptcy, mortgage, foreclosure, equity receivership, or other proceeding to reorganize, conserve, or liquidate the [member] or its property and any other

suit against any receiver, conservator, or trustee of the [member] or its property.' 15 U.S.C. § 78eee(b)(2). If the SEC has pending any action against the member, it may, with the Commission's consent, be combined with the SIPC proceeding. If no such action is pending, the SEC may intervene as a party to the SIPC proceeding.

"If the court finds any of the five conditions on which an SIPC application may be based, it must grant the application and issue the decree, and appoint as trustee for the liquidation of the business and as attorney for the trustee, 'such persons as SIPC shall specify.' 15 U.S.C. § 78eee(b)(1), (3).

"The trustee is empowered and directed by the Act to return customer property, complete open transactions, enforce rights of subrogation, and liquidate the business of the member, § 78fff(a); he is not empowered to reorganize or rehabilitate the business. The SIPC is required to advance to him such sums as are necessary to complete open transactions, and to accomplish the return of customer property up to a value of $50,000. § 78fff(f)." 421 U.S. at 416–417, 95 S.Ct. at 1736, 44 L.Ed.2d at 268.

ten than not an endangered firm will avoid collapse by infusion of new capital or merger with a stronger firm. [Footnote omitted.] Even failing those alternatives, a firm may be able to liquidate under the supervision of one of the self-regulatory organizations, or the district court, without danger of loss to customers. The SIPC's policy, therefore, is to defer intervention 'until there appear[s] to be no reasonable doubt that customers would need the protection of the Act.' SIPC 1973 Annual Report 7 (1974). By this policy, the SIPC avoids unnecessarily engendering the costs of precipitate liquidations—the costs not only of administering the liquidation, but also of customer illiquidity and additional loss of confidence in the capital markets—without sacrifice of any customer protection that may ultimately prove necessary." 421 U.S. at 421–422, 95 S.Ct. at 1739, 44 L.Ed.2d at 271.

The Court also pointed to the extreme consequences that actions such as liquidation or suspension, or even the threat of them, can have:

"Except with respect to the solidest of houses, the mere filing of an action predicated upon allegations of financial insecurity might often prove fatal. [Footnote omitted.] Other customers could not be expected to leave their cash and securities on deposit, nor other brokers to initiate new transactions that the firm might not be able to cover when due if a receiver is appointed, nor would suppliers be likely to continue dealing with such a firm. These consequences are too grave, and when unnecessary, too inimical to the purposes of the Act, for the Court to impute to Congress an intent to grant to every member of the investing public control over their occurrence. On the contrary, they seem to be the very sorts of considerations that motivated Congress to put the SIPC in the hands of a public board of directors, responsible to an agency experienced in regulation of the securities markets. [Footnote omitted.]" Id. at 422–423, 95 S.Ct. at 1739, 44 L.Ed.2d at 271.

█ The Securities Investors Protection Act does not apply to the facts of this case, but, in our view, the policy considerations mentioned by Justice Marshall are helpful in our analysis of the Exchange's actions in the instant· case. At the time of this case, the difficult policy considerations faced the Exchange rather than the SIPC. We believe that the same flexibility in response should be allowed the Exchange as is now allowed the SIPC. As long as the Exchange takes prompt action to investigate alleged violations, and, having ascertained that violations exist, takes action reasonably designed to restore compliance with the rules, courts should not substitute their retrospective judgment concerning the appropriate action. The evaluation of an exchange's response to a violation of its rules must be made in the light of all the circumstances of the particular case. Because each case must be individually evaluated, no standard formula is possible. However, one important factor will frequently be present. The regime established by the Securities Exchange Act is one of "supervised self-regulation" (Colonial Realty Corporation v. Bache & Co., 358 F.2d 178, 182 (2 Cir.), cert. denied, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966)), suggesting that the supervisory role of the Commission is relevant to an alleged breach of an exchange's Section 6 duty.

█ The involvement of the Commission in a case is significant because it is the governmental authority charged with the enforcement of the provisions of the Securities Exchange Act. Private causes of action under the Act are justified in part because they serve to supplement the Commission's enforcement efforts. If the Commission expressly endorses a particular regulatory action taken by an exchange, that endorsement should properly be given considerable weight by a court hearing a claim that the same action constitutes a violation of the exchange's Section 6 duty. The obvious difficulty comes in attempting to determine the appropriate weight to be given to Commission action or inaction which falls

short of express endorsement. For the most part, this determination must be made on a case-by-case basis, taking into account the amount of information available to the Commission, the extent of its involvement, and the fact that the Commission has been given a secondary rather than a primary enforcement role with regard to exchange rules.

The district court found that the Commission had not taken any "formal" action against the Exchange pursuant to its powers under Section 19, 15 U.S.C. § 78s.[9] In analyzing this inaction, the district court found that the options available to the Commission were limited by (1) the Exchange's "essentially exclusive control" of the relevant information concerning the condition of member firms, and (2) the refusal of the Exchange to make its Trust Fund available to creditors of Dempsey if a receivership were imposed on the firm by the Commission. *Hughes, supra,* at 94,541. The court then concluded that the inaction on the part of the Commission could not be characterized as "an indication of either tacit administrative approval, or unequivocal administrative sanctioning of the Exchange's efforts vis-a-vis the Dempsey problem." *Id.*[10]

**9.** Section 19 provides in relevant part:

"(a) The Commission is authorized, if in its opinion such action is necessary or appropriate for the protection of investors—

"(1) After appropriate notice and opportunity for hearing, by order to suspend for a period not exceeding twelve months or to withdraw the registration of a national securities exchange if the Commission finds that such exchange has violated any provision of this chapter or of the rules and regulations thereunder or has failed to enforce, so far as is within its power, compliance therewith by a member or by an issuer of a security registered thereon.

\* \* \* \* \* \*

"(3) After appropriate notice and opportunity for hearing, by order to suspend for a period not exceeding twelve months or to expel from a national securities exchange any member of [sic] officer thereof whom the Commission finds has violated any provision of this chapter or the rules and regulations thereunder, or has effected any transaction for any other person who, he has reason to believe, is violating in respect of such transaction any provision of this chapter or the rules and regulations thereunder.

"(4) And if in its opinion the public interest so requires, summarily to suspend trading in any registered security on any national securities exchange for a period not exceeding ten days, or with the approval of the President, summarily to suspend all trading on any national securities exchange for a period not exceeding ninety days.

"(b) The Commission is further authorized, if after making appropriate request in writing to a national securities exchange that such exchange effect on its own behalf specified changes in its rules and practices, and after appropriate notice and opportunity for hearing, the Commission determines that such exchange has not made the changes so requested, and that such changes are necessary or appropriate for the protection of investors or to insure fair dealing in securities traded in upon such exchange or to insure fair administration of such exchange, by rules or regulations or by order to alter or supplement the rules of such exchange (insofar as necessary or appropriate to effect such changes) in respect of such matters as (1) safeguards in respect of the financial responsibility of members and adequate provision against the evasion of financial responsibility through the use of corporate forms or special partnerships; (2) the limitation or prohibition of the registration or trading in any security within a specified period after the issuance or primary distribution thereof; (3) the listing or striking from listing of any security; (4) hours of trading; (5) the manner, method, and place of soliciting business; (6) fictitious or numbered accounts; (7) the time and method of making settlements, payments, and deliveries and of closing accounts; (8) the reporting of transactions on the exchange and upon tickers maintained by or with the consent of the exchange, including the method of reporting short sales, stopped sales, sales of securities of issuers in default, bankruptcy or receivership, and sales involving other special circumstances; (9) the fixing of reasonable rates of commission, interest, listing, and other charges; (10) minimum units of trading; (11) odd-lot purchases and sales; (12) minimum deposits on margin accounts; and (13) similar matters."

**10.** In a different part of the opinion, the district court distinguished its resolution of the instant case from the *Baird* court's determination that a breach of duty had occurred, in part because of the difference in the Commission's role in the two cases. It noted that in *Baird* the Commission's role was "virtually nonexistent" because of the surreptitious nature of Whitney's activities. In contrast, in the instant case, "the Exchange did make some *attempt* to inform the Commission and all subsequently interested persons, including King and Hughes, of the

As already indicated, we do find some indication of tacit approval from the lack of Commission action. The district court's description of the role of the Commission and indeed the emphatic opposition by some of its officials to the Exchange plan at the meeting of October 24, 1969, suggests that lack of information was not a major obstacle to action by the Commission. The existence of the Trust Fund is completely irrelevant to an appraisal of the Commission's action or inaction. The Commission's duties and its choice of responses were established by statute. There was no statutory recognition of or provision for the Trust Fund, which was the creation of the Exchange and its members.

The district court also held that the inaction by the Commission did not immunize the Exchange from liability under Section 6. In reaching this conclusion, the court analogized the instant case to the Supreme Court decisions in *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1962), and *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973), in which the Court attempted to reconcile the potential conflict between the antitrust laws and regulatory schemes such as that established by the Securities Exchange Act.

In our view, the district court misconceived the lesson to be drawn from those and subsequent cases and drew too direct an analogy between them and the instant case. In *Silver* and its progeny the Supreme Court was faced with the problem of reconciling two bodies of law with potentially inconsistent norms. Implied immunity is the proper analysis where it appears that Congress intended for certain matters to be decided within the regulatory system established by the securities laws rather than to be subjected to the full force of the antitrust laws. The problem in the instant case is fundamentally different because

there is only one body of law at issue. The difficulty here arises because there are two entities, the Exchange and the Commission, both of which are charged with the enforcement of the *same* law. Consequently, the issue here is the weight to be attached to the actions taken by the superior authority in assessing the reasonableness of the actions of the inferior one. The Supreme Court's decisions regarding implied antitrust immunity do bear on this question, but not in the way suggested by the district court.

The Court held in *Gordon v. New York Stock Exchange*, 422 U.S. 659, 691, 95 S.Ct. 2598, 2615, 45 L.Ed.2d 463, 484 (1975), that the fact that a particular matter falls within the provisions of § 19(b), 15 U.S.C. § 78s, giving the Commission authority to "alter or supplement the rules of such exchange" is an important consideration in determining the weight to be attached to Commission action or inaction in an antitrust action. When the exchange action at issue involves one of the categories listed in Section 19(b), the options open to the Commission are greater, and its action or inaction should be accorded greater weight. Applying this approach to the instant case, we find that Section 19(b) explicitly gives the Commission the power to initiate rule changes involving "safeguards in respect of the financial responsibility of members", which is precisely the subject at issue here.

Hughes has alleged violations by Dempsey of a large number of Exchange rules [11] as a basis for his claim that the Exchange breached its duty to enforce its rules. All of the violations were simply different manifestations of the same basic problems facing Dempsey. Our conclusion as to whether the Exchange has breached its duty turns on an assessment of the Exchange's response to those problems within the context of those rules, not on whether a

---

past status and current condition of Dempsey (irrespective of the attempt's final effect.)". *Hughes, supra,* at 94,545. The court's language leaves it somewhat unclear whether the significant factor was the effort made by the Exchange or the involvement of the Commission.

11. The various rules at issue in this case and a summary of their provisions are set out in the district court's opinion. *Hughes, supra,* at 94,-527 n. 2.

particular rule has been violated. Therefore, it is not necessary for us to decide whether the violation of each of the various rules relied on by Hughes would by itself give rise to a private cause of action. *See Colonial Realty Corp. v. Bache & Co.,* 358 F.2d 178 (2 Cir.), *cert. denied,* 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966). It may, however, be useful to illustrate how we would apply several representative rules under the flexible analysis adopted above. For these purposes, we will use Article XIII of the New York Stock Exchange Constitution and Rule 325, each of which will, in our view, support a private cause of action.

Article XIII of the Exchange's Constitution was heavily relied upon by Hughes in his argument under Section 6. In essence, it requires suspension by the Exchange of any member firm in the following three situations: (1) failure to perform its contracts, (2) insolvency, and (3) a financial or operating condition such that it cannot be permitted to continue in business with safety to its creditors or the Exchange. By its terms, Article XIII leaves no choice concerning the Exchange's response when its conditions are satisfied.' However, the determination of the existence of the conditions does necessarily leave room for interpretation. We would not lightly second-guess the Exchange's assessment of safety of a particular firm's condition, but there

clearly may be a point at which the Exchange's assessment could no longer be accepted.

 Hughes also placed heavy emphasis on Dempsey's admitted violation of Exchange Rule 325 which specifies the maximum ratio of debt to net capital for member firms.[12] Rule 325 does not specify the appropriate action to be taken in the event that a member firm is in violation. As suggested above, we reject Hughes' argument that suspension is the only permissible response when a firm is found to be in net capital violation. The net capital rule is undoubtedly one of the most important provisions designed to protect the investing public, but an inflexible approach to its enforcement is not justified.

 Having described the appropriate standards, we now turn to an evaluation of the Exchange's actions in the two relevant periods. With regard to the failure of the Exchange to suspend Dempsey in the fall of 1969, we agree with the district court's conclusion that the Exchange's conduct did not constitute a breach of its Section 6 duty. It is undisputed that in the fall of 1969 Dempsey had serious problems, including a serious violation of the Exchange's net capital rule. Given the industry-wide experience with many of the types of problems facing Dempsey, the restrictions imposed by the Exchange were reasonably addressed to the

---

12. New York Stock Exchange Rule 325 provides in relevant part:

"(a) No member or member organization doing any business with others than members or member organizations or doing a general business with the public, except a member or member organization subject to supervision by State or Federal banking authorities, shall permit, in the ordinary course of business as a broker, his or its Aggregate Indebtedness to exceed 2000 per centum of his or its Net Capital, which Net Capital shall be not less than $25,000 in the case of any other member or member organization subject to this rule, unless a specific temporary exception is made by the Exchange in the case of a particular member or member organization due to unusual circumstances.

"The initial Net Capital of a member corporation shall be at least 120% of the Net Capital required to be maintained by this rule.

"The Exchange may at any time or from time to time in the case of a particular member or member organization prescribe greater requirements than those prescribed herein.

"Each member or member organization shall promptly notify the Exchange if his or its Net Capital does not equal or exceed the minimum required by this rule."

The Commission has its own net capital rule establishing minimum capital requirements for brokers, but it provides an exemption which includes "any member in good standing and subject to the capital rules * * * of the New York Stock Exchange * * * whose rules, settled practices and applicable regulatory procedures are deemed by the Commission to impose requirements more comprehensive than the requirements of this rule." SEC Rule 15(c)(3)–1(b)(2); *see* 17 C.F.R. § 240.15c3–1(b)(2) (1973).

origins of Dempsey's problems. The failure to suspend Dempsey did involve certain risks, but so did the prospect of suspending the firm. The Exchange's response was not the most drastic one available to it, but given the legitimate concern over the effect which an immediate suspension of Dempsey might have on the entire securities industry, it was not an unreasonable one.

This conclusion is buttressed by the action of the Commission during the fall of 1969. Although there is evidence that certain officials at the Commission disagreed with the Exchange's strategy, the Commission did not take any of the alternative courses of action available to it under the Securities Exchange Act.

 Turning to the second relevant period, we conclude that the Exchange's decision to lift the previously imposed restrictions from Dempsey cannot be similarly sustained. Evaluated under the standard described above that decision constituted a breach of the Exchange's Section 6 duty. The district court's holding to the contrary was "clearly erroneous" within the meaning of Section 52(a) of the Federal Rules of Civil Procedure. The Exchange had earlier attributed Dempsey's operational and financial problems in large part to the firm's inability to process its volume of business. The restrictions were generally designed to reduce that volume to a point at which the firm could handle it. In lifting the restrictions, the Exchange invited an aggravation of the very problems which had prompted the restrictions in the first place. The Exchange has presented nothing to support an argument that the restrictions were no longer necessary. Put simply, the Exchange cannot have it both ways. Either the restrictions were not a sufficient response to Dempsey's problems in the fall of 1969, indicating a breach of duty at that time, or they were a sufficient response, indicating that their subsequent removal

was a breach of duty in March of 1970. Without the restrictions, the only response by the Exchange to the very serious problems of Dempsey was the addition of new capital. This failure of the Exchange to take constructive action toward the underlying problems of Dempsey constitutes a clear breach of its duty. If the Exchange determined that the lower level restrictions had not succeeded, it was obligated to suspend the firm. Instead, its attempted resolution so ignored the Exchange's duty owed to investors and potential investors in Dempsey that it far exceeds any permissible degree of discretion or flexibility in choosing a response. We are bothered by the fact that the action of the Commission paralleled that of the Exchange in that the Commission lifted its prohibition on underwritings by the firm at the same time that the Exchange lifted its restrictions. The breach in this case is so clear, however, that the weight to be accorded to the Commission's action does not alter our conclusion.

## HUGHES' RIGHT TO RECOVER FOR THE EXCHANGE'S BREACH

 We have concluded that the district court erred in holding that the Exchange did not breach its Section 6 duty when it lifted the previously imposed restrictions from Dempsey. That conclusion raises the subsequent question of Hughes' right to recover for that breach. Because of its resolution of the first question, the district court naturally did not reach the second. Various theories which might be invoked to deny Hughes' right to recover have been briefed and argued. Considering the thoroughness of the district court's findings of facts and the already protracted nature of this litigation, we feel that it is both possible and appropriate to decide those issues at this time.

 We hold that Hughes is barred by the doctrine of waiver [13] from recovering

13. We emphasize that our conclusion that Hughes has waived his right to recover is not influenced by his signing a so-called "knowledgeability letter" directed to the Exchange. The letter stated that Hughes had investigated

the desirability of the subordination agreement, that he was familiar with the restrictions imposed on Dempsey, and that he agreed that the Exchange would not be liable to him with respect to his subordination loan. Regardless of

for any losses that he might have suffered as a result of the Exchange's breach of its Section 6 duty. In *Royal Air Properties, Inc. v. Smith,* 312 F.2d 210 (9 Cir. 1962), we held that the doctrine of waiver can be invoked to bar recovery in an implied civil action brought under Rule 10b–5. In appropriate circumstances, the same defense can be invoked to bar recovery in an implied civil action brought under Section 6. In the second appellate consideration of *Royal Air Properties, Inc. v. Smith,* 333 F.2d 568 (9 Cir. 1964), we stated that:

> "[W]aiver of rights under the Securities Exchange Act of 1934 should be limited to those cases where it is intended, and that therefore the right in question must be found to be actually known before waiver becomes effective." 333 F.2d at 571.

It is our opinion that the findings of fact of the district court indicate quite clearly that Hughes did knowingly waive his right to recover for the Exchange's breach of duty.

In the circumstances of this case, Hughes is an extremely unsympathetic plaintiff. Before entering into the subordination agreement, he knew the risks which accompanied his decision. However, for purposes of evaluating a possible waiver defense, it is necessary to focus more specifically on Hughes' knowledge of the action which has been determined to constitute a breach of the Exchange's duty—the lifting of the restrictions. Hughes not only knew of that action before he entered into the agreement, he actually contributed to its occurrence. He had actual knowledge that the Exchange had imposed restrictions on Dempsey's operations and that those re-

strictions had been imposed for the protection of the investing public, of which he was a part. Not only did Hughes invest with the actual knowledge that the restrictions had been lifted, he also knowingly conditioned his agreement on the lifting of the restrictions. Allowing Hughes to recover for a breach of duty which he encouraged would not further the purposes of the Act. As we stated in the first *Royal Air Properties* case,

> "The purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act." 312 F.2d at 213–214.

Hughes has lost his innocence.

## HUGHES' OTHER SECURITY LAW CLAIMS

Hughes also challenges the district court's dismissal of his other claims based on the securities laws. These challenges essentially go to the findings of fact by the district court rather than the correctness of the legal standards applied by it. The linchpin to the analysis of Hughes' arguments concerning these questions is the district court's finding that complete disclosure was made to Hughes on the eve of his execution of the subordination agreement. Having reviewed the record, we cannot conclude that the findings of the district court concerning disclosure were clearly erroneous. Therefore, they form the basis of our examination of the remaining issues in this appeal.

We begin our discussion with the alleged liability of Whitney under Rule 10(b)–5 [14]

the applicability of the letter to the breach found in this case, any waiver included in such a letter would be rendered void by Section 29 of the Securities Exchange Act, 15 U.S.C. § 78cc. We find Hughes to have waived any right to recover not from what he signed, but from what he knew and from what he did.

14. Rule 10(b)–5, 17 C.F.R. 204.10b–5, provides that:

> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of

the mails, or of any facility of any national securities exchange,

> "(1) to employ any device, scheme, or artifice to defraud,

> "(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> "(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

for alleged misrepresentations in the negotiations leading up to Hughes' execution of the subordination agreement. The district court characterized these representations as constituting "an over-simplified, self-serving hunch that everything would work out all right, and to Hughes' ultimate benefit." *Hughes, supra,* at 94,549. With very little discussion, the court assumed that these representations did constitute a violation of Rule 10(b)–5, but, citing *Royal Air Properties, Inc. v. Smith,* 333 F.2d 568 (9 Cir. 1964), held that Whitney was not liable because Hughes had waived his right to recover. We agree with the Court's result but would reach it by a different route.

■ The extent of Whitney's duty must be determined according to the flexible, duty-oriented approach to Rule 10(b)–5 established in our recent decision in *White v. Abrams,* 495 F.2d 724 (9 Cir. 1974). Under this approach, synthesis must be made of a number of factors present in this case, some supporting the imposition of a heavy duty and some a light one. Certainly, several of the factors which we enumerated in *White* as supporting a heavy duty are present here. The relationship between Whitney and Hughes was a close and long-standing one. Whitney had initiated the contact with Hughes regarding the possibility of his entering into a subordination agreement, and Whitney obviously would have derived substantial benefit from the subordination if, as anticipated, it had been instrumental in Dempsey's recovery. The reliance element is more ambiguous: Hughes certainly did rely on Whitney's judgment in making investment decisions, but this reliance was far from complete, as indicated by Hughes' own extensive business background and ability. The major factor present in this case supporting the imposition of a relatively lighter duty was characterized in *White* as relative access to the relevant information. This factor takes a somewhat different shape in this case than in *White,* because the issue here is misrepresentation

rather than failure to disclose. The district court's conclusion that complete disclosure was made to Hughes cannot end our inquiry in this case, because even in the context of complete disclosure, a misrepresentation may cause the person to whom it is addressed to discount the other information available to him. *See* Bromberg, *Securities Law,* 8.4(651)(2). Nevertheless, the fact that complete disclosure has been made, making the plaintiff's access to the relevant information complete, is a major consideration in the determination of the duty question and the ultimate question of whether recovery should be allowed.[15]

■ We conclude that although Whitney owed a heavy debt to Hughes because of the previously mentioned factors, he did not breach that duty and, therefore, is not liable. The district court's opinion is clear that Whitney acted in good faith in making the representations to Hughes. The question of whether Whitney was negligent in making those representations is less clear, but in our view not critical. The court did find that neither Whitney nor Walraven were trained as professionals in making the kind of predictions at issue here.

The statements made by Whitney cannot be considered in isolation. They were made in the context of the total presentation made to Hughes regarding the subordination agreement. The opinion and information provided by Peck, which did not support Whitney's overly optimistic views, was not merely separate contrary information available to Hughes. Rather, that information was actually solicited by Whitney in his effort to assure that Hughes was adequately informed of the consequences of his decision. There is simply no indication that Whitney was trying to provide enough disclosure to satisfy the minimum requirements of Rule 10(b)–5, while at the same time attempting to negate the effect of that information through the use of his

in connection with the purchase or sale of any security."

15. "If plaintiff has true information, he is less likely (than if he is ignorant) to sustain a cause of action for misrepresentation of that information." Bromberg, *Securities Law,* 8.4(651)(2).

influence on Hughes. Another important consideration bearing on our decision is the relative specificity of the information from Whitney and Peck. The district court emphasized the generality of the comments by Whitney and the specificity of the comments and information supplied by Peck. Although we do not hold that statements of opinion such as those made by Whitney are not actionable under Rule 10(b)-5,[16] the generality of the comments is a relevant consideration. The fact that Hughes was a sophisticated businessman, although admittedly not an expert accountant, also influences our consideration of the significance of the types of information given to him. We simply are not dealing with a gullible, defenseless investor unable to protect himself from the machinations of a vastly superior opposite party. We conclude that despite the relatively heavy duty owed by Whitney to Hughes, his general expressions of opinion, which were believed by him and made in good faith with due precaution taken to ensure full disclosure, simply did not constitute a breach of the duty imposed on him by Rule 10(b)-5

 We now turn to the other main contention of Hughes, that the Exchange is primarily liable under Rule 10(b)-5 for the actions it took in the course of its regulation of Dempsey after learning of the firm's violations of the rules. The district court held that Rule 10(b)-5 did apply to those actions by the Exchange because its involvement touched "every relevant facet of this case". *Hughes, supra,* at 94,552. The district court analyzed the question of the Exchange's liability by reference to its previous determination that the Exchange had not breached its duty under Section 6. While adequate performance of the Section 6 duty may in some ways suggest the ab-

sence of a violation of Rule 10(b)-5, we think that a more direct form of analysis is preferable. This conclusion is mandated in this case because of our reversal of the district court on the question of the Exchange's decision to lift the restrictions from Dempsey. We need not, however, pursue the analogy suggested by Hughes between the instant case and *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), because of the district court's finding that complete disclosure had been made to Hughes. That degree of disclosure is simply inconsistent with Hughes' argument that the Exchange's regulation of Dempsey was a "course of business" or a "device, scheme, or artifice" that operated as a fraud on Hughes.[17]

The failure of Hughes to establish the primary liability of the Exchange and of Whitney under the relatively most liberal requirement of Rule 10(b)-5 makes it unnecessary to discuss the other points raised by him on appeal concerning possible liability under the less sweeping coverage of Section 12(2) and 17(a) of the 1933 Act. We similarly reject Hughes' arguments concerning the vicarious liability of Dempsey for its employees or the vicarious liability of the Exchange as a "controlling person" of Dempsey. In our view, this is simply an inappropriate case for the "fraud" provisions of the securities laws, even with their expansive interpretation.

Affirmed.

SNEED, Circuit Judge (concurring in result):

I reach the same conclusion as Judge Renfrew but by a somewhat different route.

---

**16.** Some expressions of opinion clearly are actionable. *See, e. g., Marx v. Computer Sciences Corp.,* 507 F.2d 485 (9 Cir. 1974); *G & M, Inc. v. Newbern,* 488 F.2d 742 (9 Cir. 1973).

**17.** Hughes has attempted to argue for the first time on appeal that the Exchange is liable under Section 12(2) and 17(a) of the 1933 Act and Section 10(b) of the 1934 Act and Rule 10(b)-5 because of its participation in the preparation

of the various materials supplied to Hughes by Peck. Although the district court did not directly address this question in its opinion, its treatment of the materials supplied by Peck is, in our view, inconsistent with a finding of liability. The district court, as noted above, found that Peck's presentation, oral and documentary, constituted full disclosure to Hughes.

The district court in my view was correct in holding that the Exchange did not violate its duty to Hughes in lifting in March, 1970 the restrictions which it had imposed in 1969.[1] Under the circumstances which

1. The substance of the district court's position is as follows:

"The following are the dispositive conclusions of fact and law which provide the resolution to that question concerning the section 6 duty of the Exchange:

(1) the Exchange initially became aware of Dempsey's difficulties in 1964–1965, and, during that period, it *ordered compliance* by Dempsey with the Exchange's capital and record-keeping rules;

(2) the Exchange *subsequently restricted* Dempsey's business, including the limiting of weekly trades, and the requiring of an infusion of new capital, which eventually came from the Dempsey partnership;

(3) the Exchange *sanctioned Dempsey's management*, which eventually resulted in the installation of new leadership under Whitney;

(4) the Exchange sought to accommodate the interests and concerns of the Commission, the regulatory body ultimately responsible for the conduct of Dempsey, and attempted to cooperate as much as possible with that agency by keeping it apprised of developments (however, too often this effort was compromised and curbed by factors beyond the control of both the Exchange and the Commission, including imponderable economic forces);

(5) the Exchange solicited subordinated capital to shore up Dempsey, *but only under certain conditions* which were carefully and clearly communicated to the two proposed subordinators, King and Hughes, and which included a substantial *unknown factor* of incalculable weight in affecting the eventual outcome of the subordination solution;

(6) the Exchange subsequently determined that Dempsey was facing increasingly serious difficulty, but that the planned subordinations still *might* solve Dempsey's problems, hence the Exchange determined not to suspend Dempsey, or to so restrict its business as to amount to a termination of Exchange support and backing—*such determination was highly presumptuous yet still implemented* in good faith;

(7) the Exchange viewed the proposed subordination by Hughes as a *partial remedy* for Dempsey, which view was essentially in accord with that of Peck (who had been hired by Dempsey under the reorganization efforts instigated by the Exchange, and who had also communicated in reasonably complete and coherent terms to Hughes at the final conference prior to subordination, and which was supported by documentation available for Hughes' personal, professional assessment for a sufficient period of time prior to his entry into subordination;

(8) the Exchange concluded that the *nature and extent of* the risk in the Hughes' subordination scheme was *reasonably apparent* to Hughes, and assumed that he was fully aware that Dempsey's recovery was premised on *contingent factors*, other than the mere infusion of a stated amount of capital, which factors were beyond the prediction and control of the Exchange, and thus beyond its duty to disclose;

(9) the Exchange's conclusions and assumptions, including its *doubt* about Dempsey's recovery, were patently described to Hughes by Peck, which description raised not only the hard "known" data at the time, but the presence of the "unknowns" which had to be accounted for; and

(10) the Exchange did not foresee, could not have foreseen, *nor should it have been required to foresee*, the subsequent surprise factor that market conditions would undergo a dramatic, rapid and sharp decline almost immediately after the Hughes' subordination entered into force—these market conditions were decisively fatal to the reorganization plan Peck explained to Hughes on the eve of subordination.

Based upon an overall assessment of the above dispositive conclusions, it cannot be determined that, under the specific circumstances of Hughes' subordination of his securities, the Exchange breached its section 6 duty toward Hughes, in light of the facts of which it had knowledge, or reasonably could have acquired, by the time of his subordination, and in light of the prior and contemporaneous conduct practiced and measures taken during the relevant period from the time the Exchange first became aware of Dempsey's deficiencies to the time of Hughes' subordination. Although it was controversial, it was not unreasonable for the Exchange to refrain from taking further, perhaps more drastic, measures against Dempsey prior to Hughes' subordination (particularly in light of the two priorities previously determined and implemented within its discretionary powers vis-a-vis member firms, which determination, incidentally, also stemmed from the section 6 obligation, *see* discussion, *supra* at 179–180. And, although it was momentous, it was not an abuse of discretion, nor a violation of a statutory charge, for the Exchange to affirmatively solicit a subordination with the character, qualifications, and understanding, of that which was eventually consummated with Hughes. A contrary finding under the section 6 theory of recovery would appear to place national securities exchanges in an impossible position of making an ultimate choice between two alternative courses of action—either to submit themselves to a form of strict liability for the potential risks inherent in the type of protec-

the Exchange confronted in March, 1970 the lifting of the restrictions was within what Judge Renfrew describes as a "permissible degree of discretion or flexibility in choosing a response." See p. 174, *supra.* Lifting the restrictions is not made inappropriate merely because imposing them in 1969 was proper. The possibility of acquiring the subordinated capital of King and Hughes in 1970 placed before the Exchange new circumstances. The reasonableness of the Exchange's response thereto in the light of its Section 6 responsibilities must be determined by reference to these new circumstances. What was a proper response in the absence of such circumstances may be improper in the light of changed conditions. The Exchange, in defending both the imposition and removal of restrictions, is not, in my opinion, having it both ways as Judge Renfrew suggests. It is defending a response made possible by the appearance of King and Hughes which was not unreasonable.

The possibility that this conclusion is erroneous does not trouble me greatly because I join Judge Renfrew in holding that Hughes is barred from recovery by waiver.

I also agree that there should be no recovery under rule 10b–5 or the other provisions of the securities laws. The district judge found that Hughes had "*actual knowledge* of all the *material facts available* to a reasonably prudent investor . . . ." [1973 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 94,-133 at p. 94,549 (Emphasis the court's). This finding is not clearly erroneous. Fed. R.Civ.P. 52(a). The quantum of disclosure provided Hughes, and his lack of diligence in analyzing those disclosures and reasonable inferences to be drawn therefrom, simply preclude Hughes from stating a 10b–5 cause of action against any of the defendants.[2]

TRASK, Circuit Judge (concurring in the opinion in part but dissenting from the judgment):

I concur with the opinion of the majority in deciding that the acts and failures to act of the Exchange were violations of its section 6(b) responsibilities under the Securities Exchange Act of 1934, 15 U.S.C. § 78f(b), which would entitle a plaintiff if injured by them to a private action for damages.[1] It is clear also to me that those

---

tive scheme devised to preserve Dempsey, or to forego equally important obligations—legal *and* ethical—to other members of their national organizations and their clients. Such a choice does not seem to make sense under the Securities Exchange Act for it would at once remove fundamental flexibilities and discretions necessary for the effective functioning of national securities exchanges. Accordingly, the section 6 duty accorded to Hughes under the Securities Exchange Act was not breached by the Exchange." (footnote omitted) [1973 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 94,133 at p. 95,-545 (Emphasis the court's).

2. There are a multitude of grounds available to articulate this denial of recovery to a plaintiff who has full knowledge, including no breach of duty of disclosure by the defendant, no due diligence by the plaintiff, no reliance by the plaintiff, waiver, and assumption of the risk. *See generally*, A. Bromberg, Securities Law: Fraud, Sec. 8.4(651)–(652) (1974).

1. The Securities Exchange Act of 1934, 15 U.S.C. § 78f(b), indicates a clear intention to protect persons dealing through member brokers by providing for their suspension and expulsion. Such intent is cemented by section 6(d) which provides:

"(d) If it appears to the Commission that the exchange applying for registration is so organized as to be able to comply with the provisions of this title and the rules and regulations thereunder and that the rules of the exchange are just and adequate to insure fair dealing and to protect investors, the Commission shall cause such exchange to be registered as a national securities exchange."
Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa follows with a jurisdictional statement that

"The district courts of the United States . . . shall have exclusive jurisdiction of violations of this title or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this title or the rules and regulations thereunder . . . ."
Although *J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), was an action by a stockholder against the corporation based upon section 14(a) of the Act, the rationale of the Court would appear to sanction the use of section 27 to enable the courts "to grant all necessary remedial relief." 377 U.S. at 435, 84 S.Ct. at 1561, 12 L.Ed.2d at 429. *See also Baird v. Franklin*, 141 F.2d 238 (2d Cir.), *cert. denied*, 323 U.S. 373, 65 S.Ct. 38, 89 L.Ed. 591

derelictions of the Exchange were a proximate cause of the loss sustained by Hughes.[2] I am unable to join with the majority's holding that Hughes is barred by the doctrine of waiver from recovering for the losses incurred as a result of a breach by the Exchange of its section 6 duty. I find this portion of the majority's opinion analytically unsound and predicated upon a series of assumptions which do not fit the facts of this case. Even were the facts otherwise, however, I would entertain serious doubts concerning the appropriateness of the waiver doctrine in a section 6(b) action against an exchange.

The majority's view is that by bargaining for the lifting of restrictions which he knew had been imposed for the protection of the investing public as a condition precedent to his subordination agreement, Hughes waived his right to recover for the Exchange's breach of duty.[3] The standard of waiver the majority uses comes from *Royal Air Properties, Inc. v. Smith*, 333 F.2d 568 (9th Cir. 1964), where we stated at 571, quoting in part *Matsuo Yoshida v. Liberty Mutual Insurance Co.*, 240 F.2d 824, 829 (9th Cir. 1957):

"[W]aiver is 'the voluntary or intentional relinquishment of a known right. It emphasizes the mental attitude of the actor.' Since waiver is a voluntary act, there must be knowledge of the right in question before the act of relinquishment can occur."

We then went on to say:

"[W]aiver of rights under the Securities Exchange Act of 1934 should be limited to those cases where it is intended, and that therefore the right in question must

be found to be actually known before waiver becomes effective."

I would add to this legal framework the common law principal that waivers in derogation of a statutory right are not favored and will not be inferred from doubtful acts or language. *Holden & Martin Lumber Co. v. Stuart*, 118 Vt. 286, 108 A.2d 387, 389 (1954), *Worley v. Johnson*, 60 Fla. 294, 53 So. 543, 545 (1910), *Colgate v. United States Leather Co.*, 73 N.J.Eq. 72, 67 A. 657, 663 (1907). Indeed, at common law, when the right in question was conferred for the benefit of the public at large rather than for the private benefit of individuals, courts employed a near-absolute prohibition upon the defense of waiver. *See City of Glendale v. Coquat*, 46 Ariz. 478, 52 P.2d 1178, 1180 (1935) and cases cited therein.

The majority relies upon the following passage from *Royal Air Properties*:

"The purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act."

While Hughes may not have been a "babe in the woods," it does not follow, as the majority assumes, that his understanding of the implications of the decision to lift the restrictions approached that of the Exchange. Indeed, the evidence indicates that his understanding of this transaction was limited both by his own lack of experience in this sophisticated area of finance and by what the Exchange did and did not tell him.

Hughes was never made fully aware of the critical situation in which Dempsey-Tegeler found itself on and before March 24, 1970, when he placed his securities with

(1944); *Rich v. New York Stock Exchange*, 379 F.Supp. 1122 (S.D.N.Y.1974); *Kroese v. New York Stock Exchange*, 227 F.Supp. 519 (S.D.N.Y.1964).

2. Although the majority does not discuss causation directly it is implicit from its denial of recovery on the basis of an affirmative defense. Lest there be any doubt, I would find that Hughes' loss is directly attributable to the failure of the Exchange to perform its statutory duty of regulation.

3. I concur in and wish to re-emphasize what the majority points out at footnote 13, that a theory of waiver cannot be built around the "knowledgeability letter" which Hughes signed. I am in complete agreement with the majority that this disclaimer or waiver runs afoul of section 29(a) of the Act, 15 U.S.C. § 78cc(a).

Dempsey-Tegeler in subordination to the claims of its creditors. For example, the problems of Dempsey-Tegeler reached back as far as 1964 and 1965 when it was determined by the Exchange that as a result of its decentralized accounting system, the firm was in violation of the Exchange's capital and record-keeping rules. From that date until its demise, Dempsey-Tegeler never seemed to be able to completely comply with the requirements of a solvent passably-operated house.[4]

Mr. Tegeler was fined $10,000 on that occasion and two other voting stockholders were fined $10,000 and $2,000 each. A surprise audit in 1968 by Haskins & Sells, certified public accountants, again revealed serious capital and accounting problems in violation of Exchange rules and some sanctions were again imposed by the Stock Exchange. The audit of 1969 disclosed only a worsening situation. The Exchange conducted an analysis by its own examiners. Senior Exchange officers and Securities Exchange Act Commissioners had been meeting at intervals during the period.

Thus, as detailed by the district court, we come to the crucial period from August 1969 to March 24, 1970, when Hughes signed and sealed his fate. After the release of the audit report of 1969, the Commission and the Exchange became increasingly concerned with the Dempsey-Tegeler situation. Their disciplinary efforts had not been successful. A meeting was held on September 25, 1969, between representatives of the Commission, officers of the Exchange and officials of Dempsey-Tegeler. The gravity of the situation was reviewed but no action was taken except to keep a close watch on developments. During a second meeting between Exchange and Commission officials, strong disagreement occurred over the question of shutting Dempsey-Tegeler down and the appointment of a receiver. The Exchange opposed such action and it was not taken. On December 11, 1969, another meeting concerning the Dempsey-Tegeler problem was held. At this meeting, as the district court noted:

". . . the project to raise subordinated capital for Dempsey was mentioned in the context of the Exchange's suggestion that the Commission refrain from taking any action lest efforts to solve the capital deficiency problem be thwarted."

Hughes' meetings with Dempsey-Tegeler were proceeding during approximately the same period. As the majority points out, Walraven and Whitney, both Dempsey-Tegeler officials and confidants of Hughes, advised Hughes at the first meeting not to commit himself unless King subordinated his stock. The second meeting occurred in February 1970, at which time a subordination agreement similar to the one being proposed to King was also submitted to Hughes. As appears from the trial court's opinion, the hard facts were not laid out before Hughes. He was told that there were problems of record-keeping but that Dempsey-Tegeler was doing a big volume of business and that it was a "viable corporation."

As pointed out by the trial court[5] the restrictions were mentioned, but explained away by saying that the reduction of offices was to streamline operations and that Dempsey-Tegeler was "doing more business than they had capital to back up," and that this was the reason for needing the subordinated capital from Hughes and King. Hughes was thus given a small pill with a large sugar coating.

4. Report of October 22, 1969, Exhibit 33.

5. "Briefly, the January 29, 1970 memorandum . . . showed that the liquidation of Dempsey's securities positions and the delivery of Dempsey's customer accounts was 'proceeding slowly', that no progress had been made in the planned registration of Siboney stock and that Dempsey's efforts to reduce its fail difference account had 'succeeded only in increasing differences . . . .' . . . In addition, the memorandum noted that Dempsey was in 'a cash pinch' which was delaying the liquidation of securities positions. . . . This report corroborated the then opinion of the SEC staff that Dempsey was running out of cash . . . ." Appellant's Opening Brief at 22 n.16.

The third meeting between Hughes, Walraven and Whitney took place on March 23, 1970. Mr. Robert Peck, an accountant and vice-president of Dempsey-Tegeler, who had been employed to help solve the problems of the company, was also present. At this time there was plain talk by Peck, who told Hughes outright that there was a "good chance" that he might lose his money if he subordinated his securities. He presented Hughes with documents containing detailed financial data which he explained and which if understood and believed would constitute a clear warning of the great risk Hughes was taking. At the same meeting, Walraven and Whitney represented to Hughes that the proposed subordination was a good idea and that there was little risk of loss. As the trial court related, Walraven and Whitney told Hughes that "as long-standing friends and trustworthy business advisors they would not suggest subordination to him if they seriously believed that he would suffer losses as a result." Their approach was to counteract the very negative presentation made by Peck. The district court concluded after listening to the evidence of what transpired at this meeting that Hughes ". . . simply followed the advice which he wanted to hear. And, he wanted to believe that subordination would be fruitful, and not based upon a substantial risk." Hughes took the documents with him and on the next day, March 24, 1970, signed the subordination agreement and collateral papers submitted for his signature, without change or modification.[6]

The district court described Hughes as a man:

". . . gifted with an uncommon ability to nurture and manage business enterprises; however, he was neither principally an investor of stocks, nor was he a trained and experienced accountant, knowledgeable in the finer details of data interpretation."

Even an experienced trader might not have understood the intricacies of the regulatory scheme of the Securities Exchange Act of 1934 and the Rules of the New York Stock Exchange. More to the point, it is highly unlikely that Hughes would have realized the significance of the violations of Rule 417, 325, 440 and 342 of the Exchange with which Dempsey-Tegeler was charged. No evidence indicates that he did.

Hughes was not shown to have any knowledge of the history or details of the meetings between the Commission, the Exchange and Dempsey-Tegeler concerning the activities of Dempsey-Tegeler which created a violation of section 6(b), or of the extent of the violation by Dempsey-Tegeler of the rules of the Exchange, including the devastating report of October 22, 1969.[7] Nor was he shown to have any understanding of the laws and regulations by which the exchanges should be controlled and in turn regulate their own business. At the December 11, 1969, meeting between officials of the Commission, the Exchange and Dempsey-Tegeler, the Exchange suggested that no action be taken by the Commission lest the efforts of the Exchange to

**6.** King had executed a subordination agreement on March 19, 1970, a fact made known to Hughes. The papers included the hold-harmless letter which the Exchange required Hughes to sign.

**7.** This report to the Board of Governors of the Exchange from the Department of Member Firms, Dempsey-Tegeler & Co., Inc. and Jerome F. Tegeler incorporated an earlier report of a similar memorandum as of April 15, 1969, which found violations of Rules 417 and 419; 325; 440; 421.50; 342 and 402(a) and imposed a fine of not more than $100,000 on the firm, not more than $50,000 on Tegeler and not more than $5,000 on Albert Gurmmersbach, a Senior Vice President.

The October 1969 report found additional rules violations including Rule 325 (capital violation); 440 (failure to maintain accurate books and records); Rule 417 (failing to keep books and records sufficient to disclose its financial condition); Rule 402(a) (failing to segregate its customers fully paid securities); and Rule 342 (failing to maintain adequate supervision and control). It also charged failure to comply with the requirements of the report of April 15. Jerome F. Tegeler admitted the charges in writing and consented to a one-year suspension as an allied member of the New York Stock Exchange.

obtain subordinated capital be undermined. This was a bald recognition that the whole unvarnished truth would upset Mr. Hughes and the Dempsey-Tegeler rescue operation.

All of this may suffice to show that while Mr. Hughes was an outstanding businessman in his own field, in this particular transaction, pressured by friends desperate to have his financial support, he was far from the sophisticated investor the majority assumes. For all these reasons, Hughes was not in a position to understand the full implications of the decision to lift the sanctions. I therefore would attach little significance to his insistence that the sanctions be lifted as a prerequisite to executing the subordination agreement.

Moreover, in grasping onto this bit of bargaining by Hughes as a justification for applying the waiver doctrine, the majority makes further unwarranted assumptions. Admittedly Hughes' motivation for insistence that the sanctions be lifted prior to the execution of the subordination agreement was self-interest. I don't think it follows, however, that when an investor bargains out of self-interest with an Exchange charged with a statutory duty of protecting the investing public, he forfeits his right to rely upon the Exchange's expertise and judgment. Bargaining for one's advantage is not tantamount in this instance to bargaining for an abandonment of a statutory duty.

The lifting of the restrictions was only the tip of the iceberg. They were imposed in the hope that Dempsey-Tegeler's underlying problem of impaired capital and questionable solvency would thereby be improved if not remedied. But neither the Exchange nor Dempsey-Tegeler nor the Commission was at all certain that the remedy would be effective. Hughes was encouraged to request that the restrictions on Dempsey-Tegeler be lifted, not by any basic understanding of the problem on his part, but at the strong suggestion of his friends at Dempsey-Tegeler who were eager to have their organization off and running again.

In arriving at the conclusion that he would execute the subordination agreement only if the Exchange would first agree to lift its sanctions, Hughes was entitled to assume, it seems to me, that investor welfare would be among the foremost considerations of the Exchange in making its decision. If he was not entitled to make this assumption, the self-regulation rationale of the 1934 Act is gravely undermined.

This, then, leads me to the last of my difficulties with the application of the waiver doctrine here. The *Royal Air Properties* case makes clear that "waiver of rights under the Securities Exchange Act of 1934 should be limited to those cases where it is intended." 333 F.2d at 571. The majority obviously assumes that the waiver defense was intended to apply in an action against an exchange brought under section 6 of the Act, although no court has ever so held. I have grave doubts as to whether this assumption is warranted.

The Securities and Exchange Act was enacted only after a Congressional determination that exchanges were incapable of curbing the abuses in the securities industry which had led to mishandling of investors' funds, wild speculation and general economic chaos after the Great Depression without some degree of government regulation. Dawidoff, *The Power of the Securities and Exchange Commission to Require Stock Exchanges to Discipline Members*, 41 Ford.L. Rev. 549, 551 (1973). Prior to this time, the exchanges were regarded as private clubs and were given great latitude by the court in disciplining errant members. As the Supreme Court noted in *Silver v. New York Stock Exchange*, 373 U.S. 341, 351, 83 S.Ct. 1246, 1253, 10 L.Ed.2d 389, 396 (1963):

"As exchanges became a more and more important element in our Nation's economic and financial system, however, the private-club analogy became increasingly inapposite and the ungoverned self-regulation became more and more obviously inadequate, with acceleratingly grave consequences. This impotency ultimately led to the enactment of the 1934 Act."

It is thus clear that while Congress intended to retain the general principle of self-regulation in the 1934 Act, that principle was to be limited severely. In the colorful language of Mr. Justice Douglas, then Chairman of the SEC, "Government would keep the shotgun, so to speak, behind the door, loaded, well oiled, cleaned, ready for use but with the hope it would never have to be used." Douglas, *Democracy and Finance* (Allen ed. 1940) 82, *quoted in Silver, supra*, at 352, 83 S.Ct. at 1254, 10 L.Ed.2d at 397. The Congressional mandate is explicit, it seems to me, that the self-interest of the exchanges was not to be placed above their duty of effective self-regulation. To allow an exchange to sidestep liability by use of the waiver doctrine here thwarts the purpose of section 6 and takes us a step backward toward the private club environment which the 1934 Act sought to eradicate.

In this regard, I also note that there is a clear trend in the law today to limit severely, if not abolish altogether, traditional common law defenses in securities and anti-trust actions, where considerations of public policy often outweigh whatever balance in equities the court finds between the individual litigants. *Perma-Life Mufflers v. International Parts Corp.*, 392 U.S. 134, 138, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982, 989 (1968). As *City of Glendale v. Coquat, supra*, indicates, this trend is not a dramatic departure from established common law principles.

In the securities area, cases frowning upon the use of common law defenses have involved actions against brokers rather than an exchange. *E. g., Pearlstein v. Scudder & German*, 429 F.2d 1136, 1141 (2d Cir. 1970), *Avery v. Merrill Lynch, Pierce, Fenner & Smith*, 328 F.Supp. 677, 680 (D.D.C.1971), *Nathanson v. Weis, Viosin, Cannon, Inc.*, 325 F.Supp. 50, 55–57 (S.D.N.Y.1971). The common rationale has been that Congress, in permitting brokers to enjoy a privileged and anti-competitive position in the securities industry structure, has imposed upon them statutory responsibilities and charged them with an intimate knowledge of the industry which an individual investor is unlikely to achieve. If a limitation upon common law defenses available to a broker might in some instances allow an unscrupulous investor to recover, this consequence is balanced by the salutary effect which the threat of private suits can have in maintaining adherence to statutory commands. These suits are, in effect, an alternative to more direct government intervention—they help to keep the government's shotgun "behind the door," to paraphrase Mr. Justice Douglas. Availability of common law defenses, such as *in pari delicto*, assumption of risk, equitable estoppel, and waiver serve to make this check upon abuses in the system's internal workings considerably less potent.

I find many of the same self-policing considerations at work when the action is directed toward an exchange rather than a broker. Even though the exchanges are only one step removed from the Securities Exchange Commission, and therefore more susceptible to direct government oversight, the unhappy facts of this case indicate that this proximity does not always assure smooth self-regulation. The information and expertise of the exchanges is also unlikely to be shared by the individual investor. Moreover, the responsibilities of the exchange emanate almost entirely from statute. Whereas a 10b–5 action against a seller of securities is in many senses analogous to a common law action for fraud, a cause of action against an exchange for a breach of statutory duty bears little resemblance to a common law action. For this reason, traditional common law defenses may be even less appropriate where the exchange is the defendant. Therefore, I think a public purpose might be served by eliminating the defense of waiver altogether from section 6 actions against an exchange.

Whether Congress intended to allow for a defense of waiver in an action against an exchange or whether the defense might otherwise be appropriate in section 6 actions are close legal questions. The majority assumes without discussion that the answer to both questions is yes. I have my doubts.

I would be more disposed to go along with the majority and resolve these doubts in favor of this Exchange had it been candid with Hughes. It just was not. It had a duty to be so. It rather attempted to get by with a partial and very minimal disclosure and insist upon Hughes signing a hold-harmless agreement to protect the Exchange against future liability. The hold-harmless letter submitted to Hughes to sign was obviously not a document drawn by the Exchange for the protection of the investor as would seem to be the appropriate role of the Exchange here. It was plainly and simply for the protection of the Exchange against action permitted by it which by implication it recognized might subject the investor to loss and it to litigation. This was not what Congress had in mind when it imposed upon the Securities and Exchange Commission a duty of regulation of exchanges and the Exchange imposed a duty of quality operation upon its members. It is the Exchange which must make the hard decisions. It has the facts and the expertise. If it chooses to risk half-way measures and encourage investments by half-informed investors, it should be held to shoulder the result if loss occurs.

I would therefore reverse and remand with directions to enter judgment against the New York Stock Exchange.

There remains the question of the disposition of the claims against Whitney and Dempsey-Tegeler.[8] It appears clear that upon these facts both Whitney and Dempsey-Tegeler are liable under the provisions of section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* and of section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. 240.10b–5, promulgated thereunder.

Rule 10b–5 provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(1) to employ any device, scheme, or artifice to defraud,

"(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security."

The misrepresentations of Whitney and Walraven at the meeting with Peck were particularly insidious in defeating the analysis of the expert called in for the purpose of establishing a record of disclosure. Their participation throughout was an exercise in conflict of interest with representation on the one hand and misrepresentation on the other. For the same reasons, Dempsey-Tegeler, as the principal on whose behalf Whitney and Walraven were acting, is equally responsible. The basic misrepresentation throughout was that Dempsey-Tegeler was fundamentally sound financially and that with the participation of King the contribution of Hughes would make the future secure for Dempsey-Tegeler. Nothing could have been farther from the truth.

I would therefore also reverse and remand with directions to enter judgment against Dempsey-Tegeler & Co., Inc. and Lewis Whitney.

---

8. Hughes' claims against Walraven were dismissed during trial.